**ABRAHAM FRUCHTER & TWERSKY LLP**
Mitchell M.Z. Twersky (MT-6739)
Jack G. Fruchter (JF-8435)
Ximena Skovron (XS-3397)
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Fax:          (212) 279-3655

*Attorneys for Plaintiff Analytical Surveys, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------------x
ANALYTICAL SURVEYS, INC.,                          :

               Plaintiff,                          :
                                                   :   Case No. 06 CV 2692 (KMW)
        - against -                                :
                                                   :
TONGA PARTNERS, L.P., CANNELL CAPITAL LLC,   :
and J. CARLO CANNELL,                              :
                                                   :
               Defendants.                         :
                                                   :
-------------------------------------------------------------------------x
```

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**ANALYTICAL SURVEYS, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Tonga Becomes a Beneficial Owner of More Than Ten Percent of ASI
        Common Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Tonga Acquires A New Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.    Tonga Decides to Exit its Investment in ASI . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E.    The Price and Trading Volume of ASI Stock Rise Sharply . . . . . . . . . . . . . . . . . 5

    F.    Notwithstanding Its Agreement in Principal to Sell the New Note to ASI,
        Tonga Converts the New Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    G.    Tonga Sells Its ASI Common Stock Within Six Months and Realizes Profits in
        Excess of $5.5 Million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    The Remedial Purpose of Section 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    ASI Has Established a Violation of Section 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Defendants Have Realized Short-Swing Profits From the Purchase and Sale
        of ASI Common Stock Within a Six-Month Period . . . . . . . . . . . . . . . . . . . . . . 10

    B.    Even if the New Note Was Merely an Amendment to the Prior Notes,
        Defendants Are Nevertheless Liable for the Conversion of the New Note
        into Common Stock at the Floating Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    Tonga Was a Statutory Insider of ASI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1.  There is No Genuine Issue of Material Fact as to Whether Tonga
    Owned More Than Ten Percent of ASI's Common Stock During the
    Relevant Time Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2.  As a Matter of Law, Tonga is Deemed a "Beneficial Owner" for
    Purposes of Section 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.  Tonga is Liable for 100% of the Short-Swing Profits Realized by It . . . 20

D.  Cannell and Cannell Capital Are Also Beneficial Owners for Purposes of
    Section 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1.  Cannell and Cannell Capital Are Liable to the Extent of Their
    Respective Pecuniary Interests in Tonga and the Short-Swing
    Profits It Realized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Beatie v. City of New York*, 123 F.3d 707 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Feder v. Frost*, 220 F.2d 29 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18, 20

*Gollust v. Mendell*, 501 U.S. 115 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Gryl v. Shire Pharms. Group Plc*, 298 F.3d 136 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973) . . . . . . . . . . . . . . 9

*Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10 (2d Cir. 2001) . . . . . . . . . . . . . . . . 10, 17

*Magma Power Co. v. Dow Chem. Co.*, No. 95 Civ. 1376 (JFK), 1997 U.S. Dist.
    LEXIS 445 (S.D.N.Y. Jan. 21, 1997), *aff'd*, 136 F.3d 316 (2d Cir. 1998) . . . . . . . . . . . 13

*Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316 (2d Cir. 1998) . . . . . . . . . . . . . . . 10, 11, 12

*Mayer v. Chesapeake, Ins. Co.*, 877 F.2d 1154 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Morales v. Quintel Entertainment*, 249 F.3d 115 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Schaffer  v. CC Invs., LDC*, 280 F. Supp. 2d 128 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . *passim*

*SEC v. Savoy Indus., Inc.,* 587 F.2d 1149 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Synalloy Corp. v. Gray*, 816 F. Supp. 963 (D. Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes and Rules**

15 U.S.C. §78b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 78b(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 78c(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78c(a)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78m(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

15 U.S.C. § 78m(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. § 78p(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 20

15 U.S.C. § 78p(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 U.S.C. § 80a-2(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 C.F.R. § 240.13d-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17 C.F.R. § 240.16a-1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

17 C.F.R. § 240.16a-1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

17 C.F.R. § 240.16a-1(a)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 C.F.R. § 240.16a-1(a)(2)(ii)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17 C.F.R. § 240.16a-1(a)(2)(ii)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17 C.F.R. § 240.16a-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17 C.F.R. § 240.16a-1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17 C.F.R. § 240.16a-1(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

17 C.F.R. § 240.16b-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

**Statutory History**

S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Regulatory Materials**

*Interpretative Release on Rules Applicable to Insider Reporting and Trading*,
    Exchange Act Release No. 18114, 1981 SEC LEXIS 679 (Sept. 24, 1981) . . . . . . . . . . . 8

**Other Authorities**

Harold S. Bloomenthal and Samuel Wolff, *Securities and Federal Corporate Law*,
    §10.11 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S. Thel, *The Genius of Section 16:  Regulating the Management of Publicly Held
    Companies*, 42 Hastings L. J. 391 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Plaintiff Analytical Surveys, Inc. respectfully submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

Analytical Surveys, Inc. ("ASI" or "Plaintiff" ), brings this action against Tonga Partners, L.P. ("Tonga"), Cannell Capital LLC ("Cannell Capital") and J. Carlo Cannell ("Cannell" and collectively with Tonga and Cannell Capital, "Defendants") pursuant to section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)") for the disgorgement of short-swing profits realized from the conversion and sale of ASI common stock (the "Common Stock") within a six month period in violation of Section 16(b). Section 16(b) is a strict liability statutory remedy having only the following elements: (1) a purchase and (2) a sale of securities (3) by a statutory insider (4) within a six month period. The undisputed facts in this case establish the existence of each of these elements and thus a claim for disgorgement of short-swing profits realized by Defendants in violation of Section 16(b).

## STATEMENT OF FACTS

### A.    Background

ASI is a small public company whose business prior to 2004 was providing digital mapping services, primarily to utility companies. Jones Dep. Tr. 47:5 (Ex. A to Declaration of Mitchell M.Z. Twersky dated November 2, 2007 (hereinafter "Twersky Decl.")). At that time, ASI had 200 employees, with field offices throughout the United States, including in New York, as well as in Puerto Rico. Jones Dep. Tr. 54:16, 22 (Ex. A, Twersky Decl.).

Defendant J. Carlo Cannell, a resident of California, created defendant Tonga, a limited partnership, as an investment fund for himself and other private investors. *See* Person Summary

1

Report (Ex. B, Twersky Decl.); Defs. Rule 56.1 St. ¶ 2. Defendant Cannell Capital serves as Tonga's general partner and is controlled by Cannell, who owns 99.9% of Cannell Capital and was at all relevant times the company's sole managing member. Defs. Rule 56.1 St. ¶¶ 4,15. Cannell testified that he made all of Cannell Capital's investment decisions. Cannell Depo Tr. 5:13 (Ex. C, Twersky Decl.).

On April 2, 2002, Cannell identified ASI as a "suitable" investment for Tonga. Cannell Depo Tr. 18:5. Following arms-length negotiations with ASI, Tonga invested $2 million in ASI and in return, acquired a senior secured promissory note from ASI (the "2002 Note"), that was convertible into Common Stock, and a warrant to purchase 5,000,000 shares of Common Stock (the "Warrant"). Defs. Rule 56.1 St. ¶¶ 22, 23; Senior Secured Convertible Promissory Note dated April 2, 2002 (Ex. D, Twersky Decl.). On or about October 29, 2003, Tonga converted $300,000 of the 2002 Note. Defs. Rule 56.1 St. ¶ 25. As a result, Tonga owned: (i) 261,458 shares (the share amount was reduced as a consequence of a 1 for 10 reverse stock split that ASI conducted on October 2, 2002); (ii) a reissued convertible note (the "Amended Note") in the amount of $1.7 million replacing the original note and; (iii) the Warrant to purchase 500,000 shares of Common Stock (after adjusting for the 1 for 10 reverse stock split). Defs. Rule 56.1 St. ¶ 26; Senior Secured Convertible Promissory Note dated November 4, 2003 (Ex. E, Twersky Decl.) The Amended Note was convertible using the same conversion formula as the 2002 Note, after adjusting for the 1 for 10 reverse stock split. Defs. Rule 56.1 St. ¶ 27.

2

## B.    Tonga Becomes a Beneficial Owner of More Than Ten Percent of ASI Common Stock

As a consequence of Tonga's acquisition of 261,458 shares of Common Stock on October 29, 2003 *(see* Defs. Rule 56.1 St. ¶ 26), Defendants beneficially owned in excess of ten percent of ASI's Common Stock.  On February 23, 2004, in a Schedule 13D, Defendants as a group reported that they beneficially owned 201,458 shares of Common Stock, or 18.6% of the outstanding Common Stock.  *See* Schedule 13D filed February 23, 2004 (Ex. F to Twersky Decl.) at Items 2, 11, 13.

## C.    Tonga Acquires A New Note

On May 28, 2004, an event of default was triggered under the Amended Note upon the SEC declaring that the Registration Statement on Form S-3 filed by ASI seeking to register shares of Common Stock issuable upon conversion of the Amended Note and the exercise of the warrant was not effective.  Defs. Rule 56.1 St. ¶ 32.

On June 30, 2004, pursuant to an agreement between ASI and Tonga, ASI cancelled the Amended Note and Warrant, and issued a new note (the "New Note").  Pls. Rule 56.1 St. ¶¶ 16, 17; Senior Secured Convertible Promissory Note dated June 30, 2004 (Ex. G, Twersky Decl.). Under the terms of the New Note, Tonga acquired the unrestricted right to obtain cash for the New Note upon maturity and was not mandatorily convertible at maturity.  New Note at 1 (Ex. G, Twersky Decl.); Defs. Rule 56.1 St. ¶ 44.  In contrast, neither the 2002 Note nor the Amended Note provided Tonga with the right to obtain cash upon maturity and instead, they contained a mandatory conversion feature that would result in an automatic conversion of the New Note upon maturity.  *See* 2002 Note at Section 3.5 (Ex. D, Twersky Decl.); Amended Note at Section

3

3.5 (Ex. E, Twersky Decl.).

The New Note, however, did contain the same conversion formula present in the 2002

Note and Amended Note:

> by dividing (x) that portion of the outstanding principal balance under this Note as
> of such date that the Holder elects to convert by (y) the Conversion Price (as
> hereinafter defined) then in effect on the date on which the Holder faxes a notice
> of conversion . . .

> . . . the term "Conversion Price" shall mean an amount equal to the lesser of (i)
> the Closing Price (as defined below) and (ii) ninety percent (90%) of the average
> of the Per Share Market Value of the Common Stock for the three (3) Trading
> Days having the lowest Per Share Market Value during the twenty (20) Trading
> Days immediately prior to the Conversion Date. . .

> The term "Closing Price" shall mean an amount equal to the lesser of (i)$.40 if the
> Reverse Stock Split is not effected prior to the Closing Date or $2.00 if the
> Reverse Stock Split is effected prior to the Closing Date and (ii) ninety percent
> (90%) of the Average Per Share Market Value of the Common Stock for the
> ninety (90) Trading Days immediately prior to the Closing Date.

New Note at 6 (Ex. G, Twersky Decl.).

## D.    Tonga Decides to Exit its Investment in ASI

In late 2004, Tonga expressed its desire to ASI to exit its investment. Jones Aff. ¶ 13. It

was highly unlikely that Tonga would be able to sell all its shares due to the extremely low

trading volume of ASI securities during that period of time, which was at or around 30,000

shares traded per day. *Id.*

In early 2004, ASI completed several large-scale contracts that had consumed working

capital, enabling it to streamline its existing business operation of digital mapping, a heavily

labor intensive and costly operation. Jones Aff. ¶ 8. These actions and events significantly

reduced the cost of ASI's business operations and generated substantial liquidity for ASI to

4

reorganize and meet its debt obligations. *Id.* With the additional cash at ASI's disposal

following the completion of these contracts, and in an effort to accommodate both Tonga's needs

and ASI's goal of paying down its debts, ASI proposed that it repurchase the New Note from

Tonga. Jones Aff. ¶ 14. Although selling the New Note back to ASI would have resulted in a

loss on Tonga's investment, it would have permitted Tonga to exit its investment without the

added risk of attempting to sell all its shares in a previously illiquid market. *Id.*

### E.    The Price and Trading Volume of ASI Stock Rise Sharply

The parties' negotiations for ASI's repurchase of the New Note proceeded through late

October and early November of 2004. In the first week of November 2004, Tonga and ASI

reached an agreement in principal to the terms of a repurchase transaction. Jones Aff. ¶ 15. ASI

scheduled a board meeting for November 11, 2004, the purpose of which was to secure approval

of the board of directors for the transaction, and the terms were set forth in a term sheet to be

proposed at the November 11 board meeting. Jones Aff. ¶ 16.

During early November, the per share price of ASI Common Stock suddenly and

inexplicably began to climb precipitously. On November 9, 2004 alone, the price of ASI

Common Stock rose from $1.35 to $4.88, an increase of 260%. Jones Aff. ¶ 18; Historical Stock

Prices for ANLT (Oct. 1, 2004 - Dec. 21, 2004) (Ex. H, Twersky Decl.). ASI's trading volume

also increased exponentially, from 7,300 shares on November 8, 2004 to 621,600 shares on

November 9, 2004. Jones Aff. ¶ 18; Historical Stock Prices for ANLT (Oct. 1, 2004 - Dec. 21,

2004) (Ex. H, Twersky Decl.). The stock price continued to increase sharply, reaching a high of

$8.74 per share on November 10, 2004, with trading volume of 8,605,100 shares. Jones Aff. ¶

19; Historical Stock Prices for ANLT (Oct. 1, 2004 - Dec. 21, 2004) (Ex. H, Twersky Decl.).

The steep rise in ASI's stock price and trading volume was a cause of great concern to ASI's Chairman, Livingston Kosberg, its Chief Financial Officer, Lori Jones, ASI's board of directors, and ASI's legal counsel, because there was no apparent reason for the sudden and inexplicable increases. Jones Aff. ¶ 20. Through various channels, ASI attempted to ascertain the reason for the increases, and even went so far as to contact NASDAQ to request assistance in determining the source of the unusual trading activity. Jones Aff. ¶ 20. ASI had not released any financial or other information that would explain such a significant increase. Jones Aff. ¶ 20. The board's reactions to this irregular trading activity is reflected in the minutes of an emergency board of directors meeting convened on November 12, 2004 (Ex. I, Twersky Decl.).

**F.     Notwithstanding Its Agreement in Principal to Sell the New Note to ASI, Tonga Converts the New Note**

Despite the parties' agreement in principal to ASI's repurchase of the New Note, on or about November 10, 2004, Cannell notified ASI of his intent to convert the entire outstanding principal balance of the New Note. Jones Aff. ¶ 17; Notice of Conversion (Ex. J, Twersky Decl.). Cannell later denied that any repurchase agreement existed. Jones Aff. ¶ 17. On or about November 10, 2004, Tonga converted 1,701,341 shares of ASI Common Stock. Pursuant to the conversion formula, the shares were converted at a price of $1.05 per share. Defs. Rule 56.1 St. ¶ 46.

6

### G.     Tonga Sells Its ASI Common Stock Within Six Months and Realizes Profits in Excess of $5.5 Million

Between November 10 and November 15, 2004, Defendants sold a total of 1,885,207

shares[1] of Common Stock at prices per share ranging from $3.69 to $6.62 as follows:

| **Date** | **Number of Shares** | **Price per Share** |
|---|---|---|
| November 10, 2004 | 183,858 | $6.62 |
| November 10, 2004 | 254,100 | $6.34 |
| November 11, 2004 | 360,074 | $4.14 |
| November 12, 2004 | 726,475 | $3.52 |
| November 15, 2004 | 360,700 | $3.69 |

Schedule 13D filed November 23, 2004 at 8 (Ex. K, Twersky Decl.).

Tonga's high velocity sale of the 1,701,341 shares it received post-conversion, which

represented 170% of ASI's outstanding one million shares prior to the conversion, in a market

that had been illiquid and at prices 5 to 6 times higher than just days prior to the conversion, was

nothing short of extraordinary. Jones Aff. ¶ 22.[2]  In fact, Tonga was the only apparent

beneficiary of the sharp increase in the trading price and volume of ASI securities, which in the

course of one week, allowed Tonga to avoid losses from the pending sale of the New Note to

ASI, and to realize $5.5 million in profits by selling the ASI shares in a previously illiquid

---

[1] In addition to the 1,701,341 shares it received as a consequence of its conversion of the New Note, Tonga had an inventory of Common Stock remaining from the 261,458 shares it acquired from the October 29, 2003 conversion of the Amended Note.

[2] Moreover, Defendants engaged in short sales in violation of 15 U.S.C. § 78p(c) ("Section 16(c)") (*i.e.*, the sale of ASI shares that they did not actually own). Cannell Dep. Tr. 69:16 (Ex. C, Twersky Decl.).

market. Jones Aff. ¶ 22. The SEC subsequently commenced an investigation of Cannell and his

broker's role in the trading of ASI securities. Cannell Dep. Tr. 50-54 (Ex. C, Twersky Decl.);

Jones Aff. ¶ 23.

**ARGUMENT**

**I.      The Remedial Purpose of Section 16(b)**

"Federal regulation of transactions in securities emerged as part of the aftermath of the

market crash in 1929." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). The Securities

Exchange Act of 1934 ("Exchange Act") was intended principally to protect investors against the

manipulation of stock prices. *Id.* (citing S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934)). This

policy is articulated in Section 2(4) of the Exchange Act, 15 U.S.C. § 78b(4), titled "Necessity

for Regulation," where Congress made a legislative determination that:

> National emergencies, which produce widespread unemployment
> and the dislocation of trade . . . and industry . . . are precipitated,
> intensified and prolonged by manipulation and sudden fluctuations
> of security prices and by excessive speculation on such exchanges
> and markets . . . .

"Prohibiting short-swing trading by insiders with nonpublic information was an important part of

Congress' plan in the 1934 Act to 'insure the maintenance of fair and honest markets' and to

eliminate such trading." *Gollust v. Mendell*, 501 U.S. 115, 121 (1991) (quoting 15 U.S.C. §78b).

"[T]he only method Congress deemed effective to curb the evils of insider trading was a flat rule

taking the profits out of a class of transactions in which the possibility of abuse was believed to

be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). As

Section 16(b) itself makes clear, its purpose is "preventing the unfair use of information which

8

may have been obtained by such beneficial owner, director, or officer by reason of his

relationship to the issuer . . ." 15 U.S.C. § 78p(b).

Congress also adopted Section 16(b) based upon evidence that "insiders actually

manipulated the market price of their stock by causing a corporation to follow financial policies

calculated to produce sudden changes in market prices in order to obtain short swing profits."

*Interpretative Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act

Release No. 18114, 1981 SEC LEXIS 679 at *2 (Sept. 24, 1981). Section 16(b) destroys this

incentive by depriving insiders of the ability to profit from short-term price fluctuations. *See* S.

Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42

Hastings L. J. 391, 433 & n.141 (1991). *See also Kern County Land Co. v. Occidental*

*Petroleum Corp.*, 411 U.S. 582, 591 (1973). The SEC does not have enforcement authority with

respect to Section 16(b) claims. *See Gollust*, 501 U.S. at 122.

**II.    Legal Standard**

A motion for summary judgment may be granted where no genuine issue of material fact

remains for trial and the moving party is entitled to judgment as a matter of law. *Beatie v. City of*

*New York*, 123 F.3d 707, 710 (2d Cir. 1997). "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The elements of a Section 16(b) claim are: (1) a purchase and (2) a sale of securities (3)

by an officer or director of the issuer or by a beneficial owner of more than ten percent of any one

class of the issuer's securities (4) within a six month period. *See* 15 U.S.C. § 78p(b); *Feder v.*

*Frost*, 220 F.3d 29, 32 (2d Cir. 2000).

9

**III.    ASI Has Established a Violation of Section 16(b)**

    **A.      Defendants Have Realized Short-Swing Profits From the Purchase and Sale of ASI Common Stock Within a Six-Month Period**

The conversion formula in the New Note provided that it was convertible into Common

Stock pursuant to the following terms:

> by dividing (x) that portion of the outstanding principal balance under this Note as of such date that the Holder elects to convert by (y) the Conversion Price (as hereinafter defined) then in effect on the date on which the Holder faxes a notice of conversion . . .
>
> . . . the term "Conversion Price" shall mean an amount equal to the lesser of (i) the Closing Price (as defined below) and (ii) ninety percent (90%) of the average of the Per Share Market Value of the Common Stock for the three (3) Trading Days having the lowest Per Share Market Value during the twenty (20) Trading Days immediately prior to the Conversion Date. . .
>
> The term "Closing Price" shall mean an amount equal to the lesser of (i)$.40 if the Reverse Stock Split is not effected prior to the Closing Date or $2.00 if the Reverse Stock Split is effected prior to the Closing Date and (ii) ninety percent (90%) of the Average Per Share Market Value of the Common Stock for the ninety (90) Trading Days immediately prior to the Closing Date.

New Note at 6 (Ex. G, Twersky Decl.).

Thus, the New Note contained both a fixed price and a floating price component. *See, e.g., Brief*

*of the Securities and Exchange Commission, Amicus Curiae, In Support of Appellee on Issues*

*Addressed*, filed in *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10 (2d Cir. 2001) at 26-

27 ("*Southbrook* Amicus Br.") (excerpt attached as Ex. L to the Twersky Decl.) (the fixed rate

component of a hybrid instrument "sets a floor below which the number of common shares

received on conversion will not decline" while the floating rate component "provides for the

investor to convert into an increasing number of common shares as the market price of the

common shares declines").

For purposes of Section 16(b), to determine the timing of a purchase of common stock underlying a convertible debt instrument containing hybrid price components such as the New Note, the SEC conceptually separates the two components into two distinct instruments. *See Southbrook* Amicus Br. at 26-27; *Schaffer v. CC Invs., LDC*, 280 F. Supp. 2d 128, 139 (S.D.N.Y. 2003). Courts in this Circuit have adopted this approach. *See Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 323 (2d Cir. 1998) ("the better approach is to treat as analytically distinct" the fixed price and floating price components of the note); *Schaffer*, 280 F. Supp. 2d at 135-36, 140 (citing and discussing *Magma Power* and expressly adopting the SEC's approach).[3]

"Therefore, under the SEC's reasoning, the acquisition (or disposition) of a hybrid instrument results in (1) an immediate acquisition (or disposition) of a derivative security [and pursuant to Rule 16b-6(a), a purchase of the underlying common stock] with respect to the minimum number of shares of underlying common stock that can be acquired under the fixed rate component, and (2) a subsequent purchase (or sale) at the time of conversion of any additional shares acquired (or disposed of) at that time under the floating rate component." *Schaffer*, 280 F. Supp. 2d at 139-40; 17 C.F.R. § 240.16b-6(a).

Applying this analysis to the New Note, Defendants are deemed to have acquired 850,000 shares on June 30, 2004 ($1,700,000 principal owed ÷ the fixed price of $2.00 per share = 850,000). Pursuant to the definition of the Closing Price quoted above, the $2.00 per share price applied as a consequence of the reverse stock split having previously occurred on October 2, 2002 (prior to the Closing Date of the New Note). *See* Excerpt from Form 10K for the fiscal year

---

[3] The views expressed by the SEC as *amicus* are accorded substantial deference. *See Gryl v. Shire Pharms. Group Plc*, 298 F.3d 136, 145 (2d Cir. 2001) (deference is given to SEC's views expressed in *amicus* briefs unless they are plainly erroneous).

11

ended September 30, 2002 at 11 (Ex. M, Twersky Decl.). Subtracting 850,000 shares from the
1,701,341 shares acquired upon conversion on November 10, 2004, results in a balance of
851,341 shares acquired at the floating price of $1.05 per share:

>      1,701,341 shares converted on November 10, 2004
>
>  –
>
>      850,000 shares acquired on June 30, 2004 (representing $1.7 million principal
>      owed divided by the fixed price of $2.00 per share)
>      _____
>      851,341 shares deemed acquired at the floating price on November 10, 2004

Pursuant to applicable SEC rules, the acquisition of 850,000 shares at the fixed price is
matchable with Defendants' sales of the Common Stock, which took place within six months on
November 10-15, 2004. In particular, Rule 16a-1(c) provides that conversion rights with a
conversion privilege at a fixed price are deemed derivative securities. *See* 17 C.F.R. § 240.16a-
1(c). Here, therefore, Defendants' right to convert the New Note at a fixed price into Common
Stock constituted a derivative security. Upon the issuance of the New Note containing a fixed
price conversion privilege that increased in value as the value of the underlying Common Stock
increased, a "call equivalent position" was established. *See* 17 C.F.R. § 240.16a-1(b) (the term
"call equivalent position" shall mean "a derivative security position that increases in value as the
value of the underlying equity increases, including, but not limited to, a long convertible security
. . . ."). Once the price was fixed, the value of the New Note increased in tandem with the value
of the underlying Common Stock into which the New Note was convertible. *See, e.g., Magma
Power*, 136 F.3d at 321 (citing 3C Harold S. Bloomenthal and Samuel Wolff, *Securities and
Federal Corporate Law*, §10.11 at 10.73 (1997)). Under Section 16(b) and the rules
promulgated thereunder, once a call equivalent position was established on June 30, 2004 with

12

the issuance of the New Note, Defendants are deemed to have acquired the 850,000 shares of

Common Stock underlying the fixed price conversion privilege contained in the New Note. *See*

17 C.F.R. § 240.16b-6(a) ("The establishment of or increase in a call equivalent position . . . shall

be deemed a purchase of the underlying security for purposes of Section 16(b) of the Act . . . .");

*see also Schaffer*, 280 F. Supp. 2d at 134 ("Thus, under the [SEC] Amendments, the acquisition,

rather than the exercise, of a derivative security with a fixed exercise price would constitute a

"purchase" for purposes of Section 16(b)").

The 851,341 shares converted at the floating price on November 10, 2004 are also

matchable with Defendants' sales. Pursuant to Rule 16a-1(c)(6), conversion rights are not

deemed derivative securities within the meaning of the Rule until the conversion price is fixed.

*See* 17 C.F.R.§ 240.16a-1(c)(6) ("The term "derivative securities" . . . shall not include . . .

Rights with an exercise or conversion privilege at a price that is not fixed").  The conversion of a

floating price security constitutes a purchase for purposes of Section 16(b). *See, e.g., Schaffer*,

280 F. Supp. 2d at 134 ("By contrast, the exercise, not the acquisition, of a derivative security

without a fixed exercise price would constitute a 'purchase' for purposes of Section 16(b)."). The

SEC makes this distinction between fixed and floating price derivative securities because it

recognized that it is not until the price is fixed that the insider can know what the potential profit

is, and set the sale price accordingly. *Id*; *Magma Power Co. v. Dow Chem. Co.*, No. 95 Civ.

1376 (JFK), 1997 U.S. Dist. LEXIS 445, *17 (S.D.N.Y. Jan. 21, 1997) (Keenan, J.), *aff'd*, 136

F.3d 316 (2d Cir. 1998).

Where there are multiple purchases and/or sales, short-swing profits earned in violation

of Section 16(b) are calculated according to the lowest price in, highest price out rule set forth by

13

the Second Circuit in *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943). *See, e.g.,*
*Mayer v. Chesapeake, Ins. Co.*, 877 F.2d 1154, 1164 (2d Cir. 1989). This rule requires that
profits resulting from the sale of the Common Stock be calculated as the difference between the
lowest purchase price(s) and the highest sale price(s) within the six month period at issue. Here,
the purchase prices consist of a $1.05 per share price (the floating conversion price) for 851,341
shares, and a $2.00 per share price (the fixed price) for 850,000 shares. *Id.* Matching the
relevant purchase and sale transactions in the order of the lowest purchase price with the highest
sale prices, the profit calculation is as follows:

| **Date** | **Number of Shares Sold** | **Profit per Share** | **Profits** |
|---|---|---|---|
| Nov. 10, 2004 | 183,858 | $6.62 - $1.05=$5.57 | $1,024,089 |
| Nov. 10, 2004 | 254,100 | $6.34 - $1.05=$5.29 | $1,344,189 |
| Nov. 11, 2004 | 360,074 | $4.14 - $1.05=$3.09 | $1,112,628.60 |
| Nov.15, 2004 | 53,309 | $3.69 - $1.05=$2.64 | $140,735.76 |
| **Subtotal (floating):** | **851,341** | | **$3,621,642.30** |
| | | | |
| Nov. 15, 2004 | 307,391 | $3.69 - $2.00=$1.69 | $519,490.79 |
| Nov. 12, 2004 | 542,609 | $3.52 - $2.00=$1.52 | $824,765.68 |
| **Subtotal (fixed):** | **850,000** | | **$1,344,256.40** |
| | | | |
| **Total:** | **1,701,341** | | **$4,965,898.70** |

14

Defendants contend that the New Note was merely an amendment of the prior notes, and that therefore, they acquired the Common Stock on April 2, 2002, when the 2002 Note was issued. This argument is in error because although the three notes contained the same conversion formula, the New Note contained several key differences that establish that the New Note was in fact a new instrument.

Specifically, the New Note provided that Tonga had the unrestricted right to obtain cash upon maturity. *See* New Note at 1 (Ex. G, Twersky Decl.) ("The outstanding principal balance of this Note together with all accrued and unpaid interest shall be due and payable on January 2, 2006 or at such earlier time as provided herein."). In contrast, neither the 2002 Note nor the Amended Note provided Tonga with the right to obtain cash upon maturity and instead, they contained a mandatory conversion feature that would result in an automatic conversion of the New Note upon maturity. *See* 2002 Note at Section 3.5 (Ex. D, Twersky Decl.); Amended Note at Section 3.5 (Ex. E, Twersky Decl.). This mandatory conversion feature was eliminated in the New Note. *See generally* New Note (Ex. G, Twersky Decl.).

The omission of this key provision, together with the right to obtain cash upon maturity, were extremely favorable terms vigorously negotiated by Tonga in order to give Tonga significantly more control over the New Note's conversion (and the price at which the New Note could be converted). Jones Aff. ¶ 11. Tonga was not able to convert its ASI shares quickly because no market existed for ASI securities at that time. Jones Aff. ¶ 13.

Furthermore, the New Note eliminated the Warrant and waived any accrued interest on the Amended Note through November 3, 2003. New Note at Section 1.1 (Ex. G, Twersky Decl.). Also, the New Note had a new maturity date, January 2, 2006, unlike the previous notes, which

15

had identical maturity dates, April 2, 2005. *See* 2002 Note at 1 (Ex. D, Twersky Decl.);
Amended Note at 1 (Ex. E, Twersky Decl.); New Note at 1 (Ex. G, Twersky Decl.).

**B.      Even if the New Note Was Merely an Amendment to the Prior Notes,
         Defendants Are Nevertheless Liable for the Conversion of the New Note into
         Common Stock at the Floating Rate**

Even accepting as true Defendants' argument that the New Note was merely an
amendment to the prior notes, the disgorgeable profits realized by Defendants in this action
would not be significantly reduced. Pursuant to *Schaffer*, the shares of underlying Common
Stock that Defendants acquired at the fixed price with the acquisition of the 2002 Note would be
outside the six-month window, but the shares of Common Stock acquired at the floating price
upon conversion that took place on November 10, 2004, would still be matchable purchases for
purposes of Section 16(b) against Defendants' sales during the same month, and Defendants are
liable for the short-swing profits realized from those purchases and sales. Specifically, applying
the *Schaffer* analysis for hybrid instruments to the 2002 Note, which contained the same
conversion formula as the New Note (*see* Ex. D, Twersky Decl. at ASI 1480), Defendants would
be deemed to have acquired 500,000 shares on April 2, 2002. ($2,000,000 principal owed ÷ the
fixed price of $4.00 per share = 500,000).[4] Subtracting 500,000 shares from the 1,701,341 shares
acquired upon conversion on November 10, 2004, results in a balance of 1,201,341 shares
acquired at the floating price, *i.e.*, the conversion price of $1.05 per share:

---

[4] The $4.00 purchase price takes into account the 1 for 10 reverse stock split that occurred
on October 2, 2002 following Tonga's acquisition of the 2002 Note. *See* Excerpt of Form 10K
for the fiscal year ended September 30, 2002 at 11 (Ex. M, Twersky Decl.).

1,701,341 shares converted on November 10, 2004

500,000 shares acquired on April 2, 2002 (representing $2 million principal owed divided by the fixed price of $4.00 per share)

1,201,341 shares deemed acquired at the floating price on November 10, 2004

The profit calculation for the 1,201,341 shares acquired on conversion at the floating price is as follows:

| Date | Number of Shares Sold | Profit per Share | Profits |
|------|----------------------|------------------|---------|
| Nov. 10, 2004 | 183,858 | $6.62 - $1.05=$5.57 | $1,024,089 |
| Nov. 10, 2004 | 254,100 | $6.34 - $1.05=$5.29 | $1,344,189 |
| Nov. 11, 2004 | 360,074 | $4.14 - $1.05=$3.09 | $1,112,628.60 |
| Nov.15, 2004 | 360,700 | $3.69 - $1.05=$2.64 | $952,248 |
| Nov. 12, 2004 | 42,609 | $3.52 - $1.05=$2.47 | $105,244.23 |
| **Total:** | **1,201,341** | | **$4,538,398.80** |

Thus, due to the hybrid nature of the 2002 Note, even under Defendants' own theory, the disgorgeable profits in this action would be $4,538,398.80. *See Schaffer*, 280 F. Supp. 2d at 139-40; *Southbrook* Amicus Br. 26-28.

### C.    Tonga Was a Statutory Insider of ASI

For the reasons set forth below, Tonga is deemed a beneficial owner of more than ten percent of ASI's Common Stock for purposes of Section 16(b).

### 1.    There is No Genuine Issue of Material Fact as to Whether Tonga Owned More Than Ten Percent of ASI's Common Stock During the Relevant Time Period

On February 23, 2004, in a Schedule 13D, Defendants as a group reported that they beneficially owned 201,458 shares of Common Stock, or 18.6% of the outstanding Common

17

Stock. *See* Schedule 13D filed February 23, 2004 (Ex. F, Twersky Decl. ) at Items 2, 11, 13.

Defendants remained beneficial owners of 18.6% of ASI's outstanding Common Stock through

November 2004, when they sold their shares. Schedule 13D filed November 23, 2004 (Ex. K,

Twersky Decl.). Therefore, Defendants owned more than ten percent of ASI's outstanding

Common Stock at the time of Tonga's matchable purchase and sale transactions in the Common

Stock, which as discussed above, occurred between June 30, 2004 and November 15, 2004.

### 2.    As a Matter of Law, Tonga is Deemed a "Beneficial Owner" for Purposes of Section 16(b)

While Defendants reported as a group their beneficial ownership of more than ten percent

of ASI's outstanding common stock, it was Tonga that actually acquired, converted, and sold the

Common Stock. As explained below, Tonga was in fact the "beneficial owner" of more than ten

percent of ASI's outstanding common stock for purposes of determining its insider status under

Section 16(b) at all relevant times.

The Exchange Act does not define a "beneficial owner." The SEC has promulgated a

definition of that term in Rule 16a-1(a)(1), which provides in relevant part that solely for

purposes of determining insider status as a ten percent beneficial owner under Section 16, the

term "beneficial owner" as used in Section 16 means "any person who is deemed a beneficial

owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder. . . ." 17 C.F.R. §

240.16a-1(a)(1); *see also Feder*, 220 F.3d at *32-34. Section 13(d)(1) provides that "[a]ny

person who, after acquiring directly or indirectly the beneficial ownership of any equity security

of a class which is registered pursuant to Section 12 of this Act . . ., is directly or indirectly the

beneficial owner of more than 5 per centum of such class shall, . . . , file with the Commission a

statement containing such of the following information . . ." 15 U.S.C. § 78m(d)(1). Section

18

13(d)(3), in turn, explicitly provides that certain entities or groups, including limited partnerships, are deemed to be a "person" and thus a "beneficial owner" within the meaning of Section 13(d):

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection.

15 U.S.C. § 78m(d)(3).

Thus, Tonga, as a limited partnership formed for the purpose of acquiring, holding, or disposing of equity securities and in fact, acted so in acquiring, holding, or disposing of ASI's Common Stock, among others, was by statutory definition a "beneficial owner" of the Common Stock it acquired and held within the meaning of Section 13(d) and therefore, is deemed a "beneficial owner" within the meaning of Section 16 for the purpose of determining its insider status.

The U.S. Court of Appeals for the Second Circuit has held that for purposes of Section 13, an agreement by a group to act in a concerted manner "may be formal or informal and may be proved by direct or circumstantial evidence." *Morales v. Quintel Entertainment*, 249 F.3d 115, 124 (2d Cir. 2001) (citing *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982); *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1163 (D.C. Cir. 1978)). Here, Tonga has conceded that it was formed for investment purposes. Defs. Rule 56.1 St. ¶ 2. Additionally, Tonga's articles of limited partnership specifically provide that the business and purpose of the partnership is "to purchase, hold, sell, sell short, trade, transfer, exchange, or otherwise dispose of . . . securities . . ." Tonga Partners L.P. Articles of Limited Partnership at Art. 2 (Ex N, Twersky Decl.). Also, irrespective of whether Tonga was a limited partnership, it is and was at all relevant times a

19

"person" within the meaning of Section 13(d)(3) because it consisted of "two or more persons act[ing] as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer . . ." 15 U.S.C. § 78m(d)(3). Accordingly, Tonga is deemed to be a "person" who had "beneficial ownership" of more than ten percent of ASI's Common Stock during the relevant time period as discussed in Section 1 above and therefore, is deemed to be a "beneficial owner" of such Common Stock pursuant to Rule 16a-1(a)(1) for purposes of determining Tonga's insider status under Section 16(b).

### 3.   Tonga is Liable for 100% of the Short-Swing Profits Realized by It

Rule 16a-1(a)(2) defines who is a "beneficial owner" for purposes of determining the extent of liability for any short-swing profits realized by such "beneficial owner" from the purchase and sale or sale and purchase of equity securities within a six-month period in violation of Section 16(b). *See Feder*, 220 F.3d at *34; 15 U.S.C. § 78p(b). Rule 16a-1(a)(2) provides that a "beneficial owner" other than for purposes of determining ten percent beneficial ownership and insider status, "shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities . . ." 17 C.F.R. § 240.16a-1(a)(2).

Tonga is a "person" within the meaning of Rule 16a-1(a)(2). Unlike paragraph (1) of the Rule discussed above, which draws upon the definition in Section 13(d) solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of securities and thereby subject to Section 16(b), paragraph (2) does not reference Section 13(d) and therefore, the definitions contained in Section 3 of the Exchange Act apply. In particular, Section 3(a)(9) provides that "[t]he term "person" means a natural person, company . . ." 15

20

U.S.C. § 78c(a)(9). Section 3(a)(19), in turn, provides that the term "company" "shall have the same meaning[] as in the Investment Company Act of 1940." 15 U.S.C. § 78c(a)(19). Section 2(a)(8) of the Investment Company Act of 1940 provides that a "[c]ompany" means a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not . . ." 15 U.S.C. § 80a-2(a)(8). As Tonga is a limited partnership, and partnerships are included in the definition of a "company" within the meaning of the Investment Company Act of 1940, Tonga is a "person" within the meaning of the Exchange Act and Rule 16a-1(a)(2) and thus is liable pursuant to Section 16(b) for the short-swing profits it realized from the purchase and sale of ASI Common Stock in violation of Section 16(b).

It is undeniable that Tonga as an entity held a direct pecuniary interest in the ASI Common Stock it acquired, held and sold, and in turn, in the short-swing profits it realized therefrom in violation of Section 16(b). *See* 17 C.F.R. § 240.16a-1(a)(2)(i) ("The term pecuniary interest in any class of equity securities shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities."). Tonga is thus liable for 100% of the short-swing profits it realized in violation of Section 16(b).

**D.  Cannell and Cannell Capital Are Also Beneficial Owners for Purposes of Section 13**

Even if Tonga was somehow correct in its contention that Tonga does not have beneficial ownership over the securities it held in the name of and for the benefit of the partnership (a contention that Plaintiff strongly disagrees with), Cannell and Cannell Capital were at all relevant times beneficial owners of more than ten percent of ASI's outstanding Common Stock for purposes of Section 13 and for purposes of determining insider status pursuant to Section 16.

21

Specifically, Rule 13d-3(a) provides that for purposes of sections 13(d) and 13(g) of the

Act, "a beneficial owner of a security includes any person who, directly or indirectly, through any

contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power .

. . of such security; and/or, (2) Investment power . . . of such security." 17 C.F.R. § 240.13d-3(a).

Here, Cannell admits that through Cannell Capital, of which he was the managing member and a

99.9% owner, he and Cannell Capital had "full and complete voting and investment power over

the limited partnership" (Defs. Rule 56.1 St. ¶¶ 5,13, 15) and that "Tonga . . . [was] formed, and

at all relevant times operated, under Mr. Cannell's direction and control." Defs. Rule 56.1 St. ¶

16. Thus, Cannell and Cannell Capital were beneficial owners of the more than ten percent of

ASI Common Stock owned by Tonga for purposes of Section 13(d) and for purposes of

determining insider status pursuant to Section 16. As such, they are subject to liability under

Section 16(b) to the extent of their pecuniary interest in the short-swing profits realized by

Tonga.

### 1. Cannell and Cannell Capital Are Liable to the Extent of Their Respective Pecuniary Interests in Tonga and the Short-Swing Profits It Realized

Profits recoverable from Cannell Capital in this case amount to $1,566,592.00, based

upon (1) an 11.547% pecuniary interest in the equity securities of Tonga in November 2004 *(see*

17 C.F.R. § 240.16a-1(a)(2)(ii)(B)) (Defs. Rule 56.1 St. ¶ 10), and (2) pursuant to Rule 16a-

1(a)(2)(ii)(C), Cannell Capital's pecuniary interest in the incentive fee paid to it by Tonga, which

amounts to 20% of Tonga's profits based upon the partnership's course of dealing in allocating

incentive fees during the third and fourth quarters of 2004, and the 20% incentive fee specifically

provided for in Tonga's investment summary dated April 12, 2004 and in Tonga's partnership

22

agreement dated December 1, 2004. *See* Tonga Partners, L.P. Partners' Capital and Net Change

in Partners' Capital for the Months Ending June 30, 2004 through December 30, 2004 (Ex. O,

Twersky Decl.); Summary of Principal Terms (D005203) dated April 12, 2004 (Ex. P, Twersky

Decl.); Amended and Restated Limited Partnership Agreement of Tonga Partners, L.P.

(D007658) (Ex. Q, Twersky Decl.). Thus, Cannell Capital's liability amounts to 31.547% of the

disgorgeable short-swing profits in this case, or alternatively, $1,566,592.00.

Similarly, pursuant to applicable SEC rules, Cannell individually is deemed to have an

indirect pecuniary interest of 99.9% of Cannell Capital's pecuniary interest (since he has a 99.9%

ownership interest in Cannell Capital (Defs. Rule 56.1 St .¶ 15) in the equity securities of Tonga,

as well as in the incentive fees earned by Cannell Capital on a monthly basis from the profits

realized by Tonga as a consequence of the purchase and sale of its equity securities.

Accordingly, Cannell is liable for the disgorgement of $1,565,025.40 in short-swing profits

realized by Tonga (representing 99.9% of Cannell Capital's liability).

If Defendants' argument that the New Note is an amendment of the prior notes is correct,

then Cannell Capital and Cannell's respective liability is reduced by the number of shares

acquired at the time Defendants acquired the 2002 Note (outside the six-month period). Under

this theory, Cannell Capital's liability is $1,431,728.60, and Cannell's liability is $1,430,296.80,

based upon the *Schaffer* analysis for hybrid instruments. *See* Section III.A. and B., *supra.*

## CONCLUSION

For the reasons set forth above, ASI respectfully requests that summary judgment be

entered in its favor against Tonga in the amount of $4,965,898.70 or alternatively in the amount

of $4,538,398.80, against Cannell Capital in the amount of $1,566,592.00 or alternatively in the

amount of $1,431,728.60, and against Cannell in the amount of $1,565,025.40 or alternatively in the amount of $1,430,296.80, plus pre and post-judgment interest,[5] and any such further relief as the Court deems proper.

Dated:      November 2, 2007                    **ABRAHAM FRUCHTER & TWERSKY LLP**
            New York, New York

                                    ___ /s/ Mitchell M.Z. Twersky ___
                                    Mitchell M.Z. Twersky (MT-6739)
                                    Ximena R. Skovron (XS-3397)
                                    One Penn Plaza, Suite 2805
                                    New York, NY 10119
                                    Telephone: (212) 279-5050
                                    Fax: (212) 279-3655

                                    *Attorneys for Plaintiff Analytical Surveys, Inc.*

---

[5] Pre-judgment interest is generally considered a part of Section 16(b) recovery. *Synalloy Corp. v. Gray*, 816 F. Supp. 963, 972 (D. Del. 1993).

24