UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ANALYTICAL SURVEYS, INC.,          |
                                   |
               Plaintiff,          |
                                   |      06 Civ. 2692 (KMW)(RLE)
       -against-                   |      OPINION AND ORDER
                                   |
TONGA PARTNERS, L.P., CANNELL      |
CAPITAL, L.L.C., and J. CARLO      |
CANNELL,                           |
                                   |
               Defendants.         |
----------------------------------X
KIMBA M. WOOD, U.S.D.J.:

    Plaintiff Analytical Surveys, Inc. ("Plaintiff" or "ASI")

brings this action pursuant to Section 16(b) of the Securities

Exchange Act of 1934 ("Section 16(b)"), 15 U.S.C. § 78p(b).

Plaintiff seeks disgorgement of alleged short-swing insider

trading profits realized by Defendants Tonga Partners, L.P.

("Tonga"); Cannell Capital, L.L.C. ("Cannell Capital"); and J.

Carlo Cannell ("Cannell") (collectively, "Defendants").

Plaintiff moves for summary judgment and Defendants cross-move

for summary judgment, or in the alternative, for partial summary

judgment.  For the reasons stated below, Plaintiff's motion for

summary judgment is GRANTED in part, and Defendants' motion for

summary judgment is DENIED in its entirety.

## I.  **Background**

    Unless otherwise noted, the following facts are undisputed

and are derived from the parties' Local Civil Rule 56.1

statements and other submissions.[1]

## A. The Parties

Plaintiff is a corporation formed under the laws of Colorado with its principal offices in Texas. (See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 1; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 20.) At all relevant times, Plaintiff was a publicly traded company, and the shares of ASI common stock were registered pursuant to Section 12 of the Securities Exchange Act of 1934. (See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 2.)

Tonga is a limited partnership formed under the laws of Delaware. (See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 3; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 1.) Tonga was primarily created to buy, sell, and hold securities for the benefit of its partners. (See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 4; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 2.)

Cannell Capital is a limited liability company originally

---

[1] With respect to Plaintiff's motion for summary judgment, (1) Plaintiff submitted a Local Civil Rule 56.1 Statement ("Pl.'s 56.1 Stmt."; D.E. 26), and (2) Defendants submitted a Response to Plaintiff's Local Civil Rule 56.1 Statement ("Defs.' Resp. to Pl.'s 56.1 Stmt."; D.E. 31). With respect to Defendants' motion for summary judgment, (1) Defendants submitted a Local Civil Rule 56.1 Statement ("Defs.' 56.1 Stmt."; D.E. 27, 48), (2) Plaintiff submitted a Response to Defendants' Local Civil Rule 56.1 Statement ("Pl.'s Resp. to Defs.' 56.1 Stmt."; D.E. 32) with a Counterstatement to Defendants' Local Civil Rule 56.1 Statement ("Pl.'s 56.1 Counterstmt."; D.E. 32), and (3) Defendants submitted a Reply to Plaintiff's Response ("Defs.' 56.1 Reply"; D.E. 33) with a Response to Plaintiff's Counterstatement ("Defs.' Resp. to Pl.'s 56.1 Counterstmt."; D.E. 33).

formed under the laws of California.[2]  (See Defs.' Resp. to Pl.'s

56.1 Stmt. ¶ 5; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 3.)  At all

relevant times, Cannell Capital was the general partner of Tonga.

(See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 6; Pl.'s Resp. to Defs.'

56.1 Stmt. ¶ 4.)

Cannell is a resident of Wyoming and California.  (See

Defs.' 56.1 Stmt. ¶ 12; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 12;

Defs.' 56.1 Reply ¶ 12.)  At all relevant times, Cannell was the

managing member and sole controlling member of Cannell Capital.

(See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 7; Pl.'s Resp. to Defs.'

56.1 Stmt. ¶ 13.)  At all relevant times, Cannell's ownership

interest in Cannell Capital was 99.9%.  (See Pl.'s Resp. to

Defs.' 56.1 Stmt. ¶ 15.)  Cannell directed and controlled the

formation and operation of both Cannell Capital and Tonga.  (See

Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 16.)

**B.  Acquisition of the April 2002 Note**

On April 2, 2002, Tonga paid Plaintiff $2,000,000 to acquire

a senior secured convertible promissory note (the "April 2002

Note").  From the acquisition date until the maturity date, Tonga

could choose to convert a portion or the entirety of the

principal (and any interest accrued thereon) of the April 2002

---

[2] Defendants do not dispute that at all relevant times, Cannell
Capital was a limited liability company existing under the laws of
California.  However, Defendants assert that Cannell Capital is
presently a limited liability company organized under the laws of
Wyoming.  (See Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 5.)

Note into shares of ASI common stock. (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 22.) The number of shares to be transferred to Tonga would be determined by dividing (1) the amount of the principal (and any interest) Tonga chose to convert by (2) the price per share. (See Hecht Decl. Ex. 6 § 3.1; D.E. 56.)

The price per share was determined by the following conversion formula: the lesser of (1) the lesser of (a) (I) $0.40 if a reverse stock split is not effected prior to conversion or (ii) $2.00 if the reverse stock split is effected prior to conversion, or (b) 90% of the average closing bid price for ASI common stock for the ninety trading days immediately prior to conversion; or (2) 90% of the average closing bid price of ASI common stock for the three trading days with the lowest closing bid price for the twenty trading days immediately prior to conversion (the "conversion formula"). (See id. § 3.2(a)-(b).) The conversion formula thus contained both a fixed price component and a floating price component.

### C.  Conversion of the April 2002 Note

On October 29, 2003, Tonga converted $300,000 of the principal of the April 2002 Note. (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 25.) As a result, Tonga owned 261,458 shares of ASI common stock and retained a principal of $1,700,000. (See id. ¶ 26.)

**D.    Acquisition of the November 2003 Note**

On November 4, 2003, following Tonga's October 29, 2003 conversion, Plaintiff issued Tonga a senior secured promissory convertible note for $1,700,000 (the "November 2003 Note").  (<u>See</u> Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 26.)  The November 2003 Note replaced the April 2002 Note, but retained the conversion formula.  (<u>See</u> <u>id.</u> ¶ 27.)

**E.    Acquisition of the June 2004 Note**

On June 30, 2004, Plaintiff issued Tonga a senior secured promissory convertible note for $1,700,000 (the "June 2004 Note") to replace the November 2003 Note.[3]  (<u>See</u> Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 40-41.)  The parties dispute whether the June 2004 Note is (1) an amended version of the November 2003 Note, or (2) a new note altogether.  (<u>See</u> Defs.' 56.1 Stmt. ¶¶ 40-41, 43; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 40-41, 43; Defs.' 56.1 Reply ¶¶ 40-41, 43.)  However, it is undisputed that the June 2004 Note retained the conversion formula set forth in the April 2002 and November 2003 Notes.  (<u>See</u> Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 42.)

**F.    Conversion of the June 2004 Note**

On November 10, 2004, Tonga converted the principal and interest of the June 2004 Note into shares of ASI common stock

---

[3] The circumstances leading to the issuance of the June 2004 Note are discussed <u>infra</u> Section II(C)(I).

(the "conversion of the June 2004 Note").  (See Pl.'s Resp. to
Defs.' 56.1 Stmt. ¶ 46.)  Specifically, Tonga converted the
$1,700,000 principal, and the interest accrued thereon, at the
price of $1.05 per share (pursuant to the floating price
component of the conversion formula -- 90% of the average closing
bid price of ASI common stock for the three trading days with the
lowest closing bid price for the twenty trading days immediately
prior to conversion).  (See id.; Defs.' Resp. to Pl.'s 56.1 Stmt.
¶ 22.)  As a result of the conversion, Tonga received an
additional 1,701,341 shares of ASI common stock.  (See Pl.'s
Resp. to Defs.' 56.1 Stmt. ¶ 46;  Defs.' Resp. to Pl.'s 56.1
Stmt. ¶ 21.)

### G.  November 2004 Sale of Shares of ASI Common Stock

Between November 10, 2004 and November 15, 2004, Tonga sold
more than 1,701,341 shares of ASI common stock in the open
market.[4]  (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 47.)  In this
action, Plaintiff seeks disgorgement of the profits realized by
Defendants from the transactions described above.

## II.  Section 16(b) Liability

### A.  Summary Judgment Standard

Summary judgment is properly granted where "the pleadings,
the discovery and disclosure materials on file, and any

---

[4] Only the 1,701,341 shares obtained upon Tonga's conversion of
the June 2004 Note are at issue in this case.

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007). The substantive law governing a case will determine which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).

The burden of demonstrating the absence of any genuine issue of material fact rests with the moving party. See Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp., 477 U.S. at 323). Once a motion for summary judgment is made and supported, "the non-moving party must set forth specific facts showing that there is a genuine issue for trial." Id. (internal quotation marks and citation omitted); see also Fed. R. Civ. P. 56(e)(2).

On cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (internal quotation

marks and citation omitted).

## B.   Overview of Section 16(b)

Section 16(b) requires statutory "insiders to disgorge profits earned in short-swing trading." <u>At Home Corp. v. Cox Commc'ns, Inc.</u>, 446 F.3d 403, 407 (2d Cir. 2006); <u>see also</u> 15 U.S.C. § 78p(b).[5]  "No showing of actual misuse of inside

---

[5] The full text of Section 16(b) is as follows:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.  Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.  This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b).

information or of unlawful intent is necessary to compel disgorgement." Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320 (2d Cir. 1998) (citations omitted). Section 16(b) imposes strict liability; it "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." Id. at 320-21. The Supreme Court of the United States (the "Supreme Court") has "noted [that] 'the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.'" Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 592 (1973) (quoting Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422 (1972)).

To establish Section 16(b) liability, a plaintiff need only show "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). After establishing Section 16(b) liability, a plaintiff may compel disgorgement of any profits realized by a statutory insider's short-swing trading.

Plaintiff seeks summary judgment, arguing that the

"undisputed facts in this case establish the existence of each of the [required] elements."  (Pl.'s Mem. 1; D.E. 38.)  Defendants seek summary judgment, arguing that (1) the undisputed facts establish that Tonga's acquisition of shares of ASI common stock falls within the Section 16(b) debt exception (<u>see</u> Defs.' Mem. 17-18, D.E. 45; Defs.' Reply Mem. 2-8, D.E. 64; Defs.' Opp. Mem. 13-16, D.E. 57); (2) in the alternative, the undisputed facts establish a "borderline" transaction and "the policies underlying the statute will not be served by applying Section 16(b) to such [a] transaction" (Defs.' Mem. 18-19; <u>see also</u> Defs.' Reply Mem. 18-20); (3) in the alternative, the undisputed facts establish that the acquisition and conversion of the June 2004 Note do not constitute Section 16(b) purchases (<u>see</u> Defs.' Mem. 9-18; Defs.' Reply Mem. 8-12; Defs.' Opp. Mem. 5-13); and (4) in the alternative, the undisputed facts reveal that any disgorgement should be limited to Cannell's pecuniary interest in the profits realized from the transactions at issue (<u>see</u> Defs.' Mem. 19-25; Defs.' Reply Mem. 12-18; Defs.' Opp. Mem. 17-23).

### C.  The Debt Exception Does Not Apply

The Second Circuit has instructed District Courts to examine the applicability of an exception to Section 16(b) before examining "whether a transaction constitutes a 'purchase.'" <u>Bruh v. Bessemer Venture Partners III L.P.</u>, 464 F.3d 202, 206 n.6 (2d Cir. 2006).  Accordingly, the Court first turns to Defendants'

argument that the acquisition of the June 2004 Note falls within the debt exception. (See Defs.' Mem. 17-18; Defs.' Reply Mem. 2-8; Defs.' Opp. Mem. 13-16.) The Court finds that the debt exception does not apply to Tonga's acquisition of the June 2004 Note.[6] Accordingly, the debt exception does not shield Defendants from Section 16(b) liability.

Section 16(b) excludes any security "acquired in good faith in connection with a debt previously contracted." 15 U.S.C. § 78b(p); see also Rheem Mfg. Co. v. Rheem, 295 F.2d 473, 475-76 (9th Cir. 1961). The "debt previously contracted" language includes only "an obligation to pay a fixed sum certainly and at all events, existing prior to and apart from the settlement of the obligation by the transfer of stock." Id. at 476; see also Heli-Coil Corp. v. Webster, 352 F.2d 156, 168 (3d Cir. 1965) (holding that the security must be acquired "in settlement of matured debts which existed apart from any existing obligation to transfer the securities"); Peter J. Romeo & Alan Dye, Section 16(b) Treatise and Reporting Guide § 13.09[4]-[5] (3d ed. 2008) ("Romeo & Dye") (the application of the debt exception requires (1) the existence of a matured, fixed, and legally enforceable debt; and (2) the independence of the debt from the obligation to

---

[6] Plaintiff argues that Defendants should be barred from raising the Section 16(b) debt exception at the summary judgment stage. (See Pl.'s Opp. Mem. 16; Pl.'s Reply Mem. 6-9, D.E. 62.) The Court need not reach this argument because, on the merits, the debt exception does not apply.

transfer stock).

<u>           i.</u>  **The Alleged Debt**

ASI defaulted on the November 2003 Note.  The November 2003 Note set forth that a "failure of the Registration Statement to be declared effective by the Securities and Exchange Commission ('SEC') on or prior to" a date certain constituted an "Event of Default."  (Hecht Decl. Ex. 8 § 2.1(c).)  After several extensions of the deadline for filing the Registration Statement, on December 29, 2003, ASI timely filed the Registration Statement.[7]  (<u>See</u> Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 31; Defs.' 56.1 Reply ¶ 31.)  However, on May 29, 2004, the SEC had not yet declared the Registration Statement effective.  (<u>See</u> Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 32.)  This triggered an Event of Default under the terms of the November 2003 Note.  (<u>See</u> <u>id.</u>)

Defendants argue that this default gave rise to a debt, which ASI then satisfied by issuing the June 2004 Note to Tonga.

_____

[7] On April 2, 2002, Tonga and ASI entered into a Registration Rights Agreement that required ASI to file a Registration Statement with the SEC by a date certain.  (<u>See</u> Defs.' 56.1 Stmt. ¶ 24; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 24; Defs.' 56.1 Reply ¶ 24.)  ASI failed to file the Registration Statement within the prescribed time period and therefore, ASI requested an extension of the filing deadline. (<u>See</u> Defs.' 56.1 Stmt. ¶ 28.)  Tonga consented to an extension and on June 1, 2002, the Registration Rights Agreement was amended to extend the filing deadline to February 28, 2003.  (<u>See</u> Defs.' 56.1 Stmt. ¶¶ 28-29.)  On February 27, 2003, the Registration Rights Agreement was again amended to extend the filing deadline to August 31, 2003.  (<u>See</u> Defs.' 56.1 Stmt. ¶ 30; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 30; Defs.' 56.1 Reply ¶ 30.)  The Registration Rights Agreement was amended for a third time to extend the filing deadline to December 31, 2003.  (<u>See</u> Defs.' 56.1 Stmt. ¶ 31; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 31; Defs.' 56.1 Reply ¶ 31.)

In early June 2004, ASI approached Tonga about extending the
deadline for the Registration Statement to be declared effective
by the SEC. (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 39.)  But
rather than amend the Registration Rights Agreement a fourth
time, ASI instead issued the June 2004 Note to Tonga to address
this default. (See Defs.' 56.1 Stmt. ¶ 40; Pl.'s Resp. to Defs.'
56.1 Stmt. ¶ 40; Defs.' 56.1 Reply ¶ 40.)

### ii.  **No Matured, Fixed, and Legally Enforceable Debt**

The Event of Default triggered, inter alia, Tonga's rights
to, at its option, (1) "declare the entire unpaid principal
balance [and] all interest accrued [t]hereon, due and payable,
and thereupon, the same shall be accelerated and so due and
payable" (Hecht Decl. Ex. 8 § 2.2; see also Pl.'s Resp. to Defs.'
56.1 Stmt. ¶ 33); (2) require ASI to pay Tonga the monetary
equivalent of 130% of the aggregate principal amount of the
November 2003 Note (see Hecht Decl. Ex. 8 §§ 2.2, 3.7(c),
3.7(f)(I); see also Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 33); and
(3) require ASI to pay Tonga approximately $38,500 in penalties
per month until the SEC declared the Registration Statement
effective (see Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 34; see also
Hecht Decl. Ex. 7 § 7(e)).

Defendants argue that the mere ability to exercise these
default rights gave rise to a matured, fixed, and legally
enforceable debt. (See Defs.' Mem. 18; Defs.' Reply Mem. 5-7;

Defs.' Opp. Mem. 15-16.)  This argument lacks merit.  An Event of Default triggered Tonga's ability to, <u>at its option</u>, exercise its default rights; these rights were not automatically exercised.[8] It is undisputed that Tonga refrained from exercising any of its default rights.  (<u>See</u>  Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 35; <u>see also</u> Hecht Decl. Ex. 12 110.)  Accordingly, the Court finds that Defendants cannot establish the existence of a matured, fixed, and legally enforceable debt.

### iii. No Independent Debt

Assuming <u>arguendo</u> that Defendants could establish the existence of a matured, fixed, and legally enforceable debt, the Court finds that Defendants cannot establish the independence of that debt from ASI's obligation to transfer stock to Tonga.

---

[8] Sections 2.2 and 3.7 of the November 2003 Note (<u>see</u> Hecht Decl. Ex. 8) and Section 7(e) of the Registration Rights Agreement (<u>see</u> Hecht Decl. Ex. 7) set forth default rights that Tonga could exercise, <u>at its option</u>.  These rights were not automatically exercised in an Event of Default.

To the extent that Defendants rely on the June 3, 2004 ASI Board of Directors Meeting Minutes to establish the automatic exercise of the third default right described in the text, Defendants' reliance is misplaced.  (Defs.' Reply Mem. 6.)  The Meeting Minutes record an ASI employee's statement that ASI was "incurring approximately $38,500 per month in liquidat[ed] damages as long as the Registration Statement [was] not effective."  (Hecht Decl. Ex. 13 2.)  However, pursuant to the Registration Rights Agreement, the failure of the SEC to declare the Registration Statement effective by a date certain required ASI to pay such damages "<u>at the option of</u>" Tonga.  (Hecht Decl. Ex. 7 § 7(e) (emphasis added).)  The Registration Rights Agreement further provides that such payments would be made due and payable only "<u>upon demand</u>." (<u>Id.</u> (emphasis added).)  Therefore, ASI was required to pay liquidated damages only if Tonga actively exercised its default right.  It is undisputed that Tonga refrained from exercising its default rights. Accordingly, an ASI employee's misunderstanding that ASI automatically owed monthly liquidated damages to Tonga fails to establish a matured, fixed, and legally enforceable debt.

Tonga's default rights were established in the November 2003 Note and the Registration Rights Agreement (as well as the three Amendments to the Registration Rights Agreement). The primary purpose of these documents is to define ASI's obligation to transfer stock to Tonga. (See, generally, Hecht Decl. Exs. 8, 11.) Accordingly, the Court finds that any debt owed by ASI to Tonga due to an Event of Default did not exist "prior to and apart from" ASI's obligation to transfer stock to Tonga. Rheem, 295 F.2d at 476. Accordingly, the Court finds that Defendants cannot establish the independence of any debt.

Defendants thus fail to establish the applicability of the debt exception to the acquisition of the June 2004 Note. Therefore, the Court finds that the debt exception does not shield Defendants from Section 16(b) liability.

### D. The Unorthodox Transaction Exception Does Not Apply

The Court now turns to Defendants' argument that the acquisition and conversion of the June 2004 Note fall within the unorthodox transaction exception. (See Defs.' Mem. 18-19; Defs.' Reply Mem. 18-20.) The Court finds that the unorthodox transaction exception does not apply to the transactions at issue.[9] Accordingly, the unorthodox transaction exception does

---

[9] Plaintiff argues that Defendants should be barred from raising the unorthodox transaction exception at the summary judgment stage. (See Pl.'s Opp. Mem. 20.) The Court need not reach this argument because, on the merits, the unorthodox transaction exception does not apply.

not shield Defendants from Section 16(b) liability.

In Kern, 411 U.S. at 594, the Supreme Court adopted a pragmatic approach to the application of Section 16(b) to "borderline" or "unorthodox" transactions.  This approach requires Courts to analyze the relevant transaction to determine whether it "may serve as a vehicle for the evil which Congress sought to prevent - the realization of short-swing profits based upon access to inside information."  Id.

The unorthodox transaction exception applies when (1) the statutory insider involuntarily participated in the relevant transaction, and (2) the statutory insider did not have access to inside information.  See Kern, 411 U.S. at 594; At Home Corp., 446 F.3d at 408.  Defendants cannot, and do not try to, establish these required factors.[10]  First, Tonga voluntarily acquired and converted the June 2004 Note because Tonga controlled the timing and circumstances of these transactions.  See Kern, 411 U.S. at 599; Steel Partners II, L.P. v. Bell Industries, Inc., 315 F.3d

_____

[10] Defendants instead rely on Steel Partners II to argue that the unorthodox transaction exception factors apply only in a "very specific class of Section 16(b) cases" where "the defendant is a corporation that is forced to exchange its shares of [a] target corporation when the target corporation takes measures to thwart [a] hostile takeover."  (Defs.' Reply Mem. 19.)  Defendants' argument is without merit.  Assuming arguendo that Steel Partners II narrowed the scope of Kern, the Second Circuit's later decision in At Home Corp. clearly expanded the scope of Kern beyond the "very specific class of Section 16(b) cases" described by Defendants. See At Home Corp., 446 F.3d at 408 (holding that "that these factors -- an involuntary transaction by an insider having no access to inside information -- are prerequisites to use of the Kern County analysis" outside of the context of a hostile takeover).

120, 126 (2d Cir. 2002); Heublin, Inc. v. General Cinema Corp., 722 F.2d 29, 31 (2d Cir. 1983). Second, Defendants cannot establish the required lack of access to inside information because at all relevant times, Tonga was an ASI shareholder with greater than ten percent ownership of ASI common stock. See Huppe v. Special Situations Fund III QP, L.P., No. 06 Civ. 6097, 2008 U.S. Dist. LEXIS 51259, at *16 (S.D.N.Y. July 3, 2008) (finding "the possibility of inside information access by virtue of [the defendants'] greater than ten percent ownership"); Romeo & Dye § 10.01(4)(iii).

Defendants instead raise an equitable argument that the acquisition and conversion of the June 2004 Note should fall within the unorthodox transaction exception established by Kern and its progeny because these transactions were "undertaken by [Tonga] for [ASI's] benefit." (Defs.' Reply Mem. 20.) Specifically, Defendants contend that "[i]t would be inconsistent with Section 16(b)'s statutory objectives to hold that after convincing [Tonga] to keep its millions of dollars invested in the company and avoid disaster, [ASI] can then compel [Defendants] to disgorge the profits realized [] as a result of the very transaction undertaken by [Tonga] for [ASI's] benefit." (Defs.' Mem. 19; Defs.' Reply Mem. 20.) Defendants emphasize that disgorgement "would penalize [Tonga] for accommodating [ASI's] financial needs at the request of management." (Defs.'

Mem. 19.)  It is undisputed that had Tonga exercised its default

rights, it "[m]ost likely" would "have forced [ASI] into

bankruptcy."[11]  (Hecht Decl. Ex. 12 110.)

However, the Court finds that Defendants' equitable argument

lacks merit.  "[N]othing in [Section 16(b)] permits the Court to

consider as a mitigating factor the issuer's intent or any

benefit inuring to the issuer, nor is there any equitable defense

available based on such theories."  Huppe, 2008 U.S. Dist. LEXIS

51259, at *17-18 (collecting cases).  Defendants thus fail to

establish that the unorthodox transaction exception applies to

the acquisition and conversion of the June 2004 Note.

Accordingly, the Court finds that the unorthodox transaction

exception does not shield Defendants from Section 16(b)

liability.

### E.    Two Section 16(b) Purchases

After finding that neither the debt exception nor the

unorthodox transaction exception shield Defendants from Section

16(b) liability, the Court turns to Defendants' argument that the

acquisition of the June 2004 Note and later conversion of the

June 2004 Note do not constitute Section 16(b) purchases.

It is undisputed that Tonga sold 1,701,341 shares of ASI

---

[11] However, the Court notes that it is undisputed that ASI
requested an extension of the deadline for the SEC to declare the
Registration Statement effective.  (See Pl.'s Resp. to Defs.' 56.1
Stmt. ¶ 39.)  Tonga refused to accommodate ASI's request.

common stock in the open market between November 10, 2004 and November 15, 2004. The parties do not dispute that these transactions constitute Section 16(b) sales. The only potential Section 16(b) purchases within six months of these sales are (1) the June 30, 2004 acquisition of the June 2004 Note, and (2) the November 10, 2004 conversion of the June 2004 Note. Finding no genuine issue of material fact, the Court concludes that both the acquisition and conversion of the June 2004 Note constitute Section 16(b) purchases.

### i.   Acquisition of the June 2004 Note

Whether the acquisition of the June 2004 Note constitutes a Section 16(b) purchase turns on whether the June 2004 Note constitutes a new note (as Plaintiff argues) or merely an amended version of the November 2003 Note (as Defendants argue).[12]

---

[12] Plaintiff points to language in the June 2004 Note and the Amended and Restated Registration Rights Agreement, executed in connection with the June 2004 Note, that suggests it was a new note. First, Plaintiff observes that the November 2003 Note was titled "Amended and Restated Senior Secured Convertible Promissory Note due April 2, 2005" (see Twersky Decl. Ex. E, D.E. 40), but the June 2004 Note was titled only "Senior Secured Convertible Promissory Note due January 2, 2006" (see Twersky Decl. Ex. G). (See Pl.'s Opp. Mem. 11.) Second, Plaintiff emphasizes that the Amended and Restated Registration Rights Agreement explicitly states: "On the date hereof, [Tonga] cancelled the Existing Note and Warrant terminating any and all obligations of [ASI] under the Existing Note and Warrant, and [ASI] has executed for the benefit of [Tonga] a new senior secured convertible promissory note due January 2, 2006 in the aggregate of the principal amount of $1,700,000." (See Pl.'s Opp. Mem. 11 (quoting Skovron Decl. Ex. A ¶ E, D.E. 54) (emphasis added).)

Defendants point to language in the June 2004 Note that explicitly states: "This Note is given in renewal, extension and rearrangement, and not in extinguishment, of the unpaid principal balance of" the November 2003 Note. (Defs.' Opp. Mem. 13 (quoting Hecht Decl. Ex. 15 § 1.1); Defs.' Mem. 17 (same).)

19

Whether the June 2004 Note constitutes a new note or merely an amended version of the November 2003 Note turns on the materiality and significance of the changes contained in the June 2004 Note.  See Romeo & Dye § 3.03[6] (Changes to "the terms of an outstanding option or other derivative security . . . may be deemed so significant that it effectively results in the grant of a new security and a cancellation of the old security for purposes of Section 16.")  The Court finds that these changes were sufficiently material and significant to make the June 2004 Note a new note for Section 16(b) purposes.  Accordingly, the Court finds that the acquisition of the June 2004 Note constitutes a Section 16(b) purchase.

It is undisputed that the June 2004 Note retained (1) the $1,700,000 principal balance of the November 2003 Note, and (2) the conversion formula set forth in the April 2002 and November 2003 Notes.  However, it is also undisputed that the June 2004 Note contained, inter alia, the following changes: (1) Tonga gained "the unrestricted right to obtain cash upon maturity," (2) the June 2004 Note eliminated a feature of the November 2003 Note requiring "automatic conversion . . . upon maturity," (3) the June 2004 Note waived "any accrued interest on the [November 2003] Note through November 3, 2003," and (4) the June 2004 Note extended the maturity date to January 2, 2006 (the April 2002 and November 2003 Notes each had maturity dates of April 2, 2005).

(Compare Pl.'s Mem. 15-16, Pl.'s Opp. Mem. 11-12 with Defs.' Mem. 16-17, Defs.' Opp. Mem. 12-13.)

The Court finds that the changes contained in the June 2004 Note, and enumerated above, constitute material and significant changes. For instance, Tonga's unrestricted right to obtain cash upon maturity and the elimination of automatic conversion upon maturity, provide Tonga a new opportunity to realize profits from inside information. Pursuant to the June 2004 Note, if inside information at the maturity date reveals that it would be difficult to trade shares of ASI common stock in the open market, then Tonga would choose to obtain cash. Conversely, if inside information at the maturity date reveals that the market price of shares of ASI common stock will increase and there will be market demand for such shares, then Tonga would choose to convert the principal (and any interest accrued thereon) into shares of ASI common stock. The November 2003 Note did not provide Tonga with this potentially remunerative choice.

Furthermore, the extension of the maturity date contained in the June 2004 Note entitles Tonga to (1) earn interest on the principal amount for several additional months, and (2) evaluate the market value of shares of ASI common stock for several additional months. See Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 29131, 1991 WL 292345, at *4 n.35 (Apr. 26, 1991)

("An extension of an option exercise period is deemed to be a redemption of an old security and grant of a new security for purposes of Section 16.") (citation omitted).

The Court thus finds that the June 2004 Note is a new note. Accordingly, Tonga's acquisition of the June 2004 Note constitutes a Section 16(b) purchase.

### ii.  Conversion of the June 2004 Note

Whether the conversion of the June 2004 Note constitutes a Section 16(b) purchase turns on the treatment of a hybrid financial instrument with a conversion formula containing both a fixed price component and a floating price component.  As explained below, the Court adopts a bifurcated approach to the treatment of such a hybrid instrument.  The Court finds that the conversion of the June 2004 Note constitutes a Section 16(b) purchase.

### a.  The 1991 SEC Amendments

The April 2002, November 2003, and June 2004 Notes are all derivative securities, "financial instruments that derive their value (hence the name) from an underlying security or index." Magma Power Co., 136 F.3d at 321.  In 1991, the SEC "adopted comprehensive amendments to its rules under Section 16(b) in order to clarify the application of the section to derivative securities."  Schaffer v. CC Invs., LDC, 280 F. Supp. 2d 128, 134 (S.D.N.Y. 2003) (citation omitted).

Under the 1991 SEC amendments, the acquisition (not the conversion) of a derivative security with only a fixed price component is a Section 16(b) purchase. See Schaffer, 280 F. Supp. 2d at 134; Magma, 136 F.3d at 321-22; At Home Corp., 446 F.3d at 407. This treatment follows from recognition that "the acquisition [] is the point at which the inside information may be advantageous." Magma Power Co., 136 F.3d at 322; see also At Home Corp., 446 F.3d at 407. At the time of conversion, "the potential for abuse of inside information is minimal" because "the insider . . . is already bound by the terms of the [financial instrument]." Magma Power Co., 136 F.3d at 322.

Under the 1991 SEC amendments, the conversion (not the acquisition) of a derivative security with only a floating price component is a Section 16(b) purchase. See Schaffer, 280 F. Supp. 2d at 134. This treatment follows from recognition that instruments with a floating price

> do not provide an insider the same kind of opportunity
> for short-swing profit since the purchase price is not
> known in advance. The opportunity to lock in a profit
> begins when the exercise price is fixed; [generally, at
> the time of conversion].

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 48 SEC Docket 216, 1991 WL 292000, at *17 (Feb. 8, 1991) (the "Release"); see also Release at *18 n.148.

The 1991 SEC amendments thus clarified the treatment of

financial instruments with only a fixed price component and financial instruments with only a floating price component, but failed to address the treatment of a hybrid instrument with both a fixed price component and a floating price component.

### b.    The SEC Amicus Brief

In <u>Levy v. Southbrook Int'l Invs., Ltd.</u>, 263 F.3d 10 (2d Cir. 2001), the Second Circuit requested the SEC's view on whether a hybrid instrument "is properly considered a fixed rate derivative or a floating rate derivative security." <u>See</u> Brief of the Securities and Exchange Commission, Amicus Curiae, in Support of Appellees on Issues Addressed, No. 00-7630, 2001 WL 34120374, at *2-3 (2d Cir. Mar. 23, 2001) (the "SEC amicus brief").[13]

The SEC amicus brief eschewed an "either/or" approach to hybrid instruments, and instead adopted a bifurcated approach. This treatment follows from recognition that with a hybrid

---

[13] Before the filing of the SEC amicus brief in <u>Levy v. Southbrook Int'l Invs., Ltd.</u>, District Courts adopted an "either/or" approach to hybrid instruments. Some District Courts treated a hybrid instrument as containing only a fixed price component. <u>See</u> <u>Levy v. Oz Master Fund, Ltd.</u>, No. 00 Civ. 7148, 2001 WL 767013, at *7 (S.D.N.Y. July 9, 2001); <u>Lerner v. Millenco, L.P.</u>, 23 F. Supp. 2d 337, 342 (S.D.N.Y. 1998).  One District Court treated a hybrid instrument as containing only a floating price component. <u>See</u> <u>Levy v. Clearwater Fund IV, Ltd.</u>, No. 99 Civ. 004, 2000 WL 152128, at *4 (D. Del. Feb. 2, 2000).
The Court notes that the March 23, 2001 filing of the SEC amicus brief in <u>Levy v. Southbrook Int'l Invs., Ltd.</u> preceded the July 9, 2001 issuance of Judge Schwartz's decision in <u>Levy v. Oz Master Fund, Ltd.</u>  However, the Court treats Judge Schwartz's decision as issuing prior to the SEC amicus brief because it is unlikely that Judge Schwartz was aware of the SEC amicus brief.  Judge Schwartz's decision does not refer to the SEC amicus brief, and Judge Schwartz's decision preceded the Second Circuit's August 23, 2001 decision in <u>Levy v. Southbrook Int'l Invs., Ltd.</u>

instrument, a statutory insider has two opportunities to profit: at the acquisition and at the conversion. SEC amicus brief, 2001 WL 34120374, at *27 (reasoning that "[t]he fixed rate component sets a floor below which the number of common shares received on conversion will not decline. The holder's opportunity to profit with respect to any additional shares of common [stock] that it may acquire at the floating rate component is not fixed until conversion.") Accordingly, the SEC advised that with a hybrid instrument, both the acquisition and the conversion constitute Section 16(b) purchases. See id. at *28.

Courts are generally "bound by the SEC's interpretations of its regulations in its amicus brief, unless they are plainly erroneous or inconsistent with the regulations." Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir. 2000) (citation and internal quotation marks omitted). The Court notes (1) the SEC did not appear as an amicus in this case, and (2) that as Defendants point out (see Defs.' Opp. Mem. 10), the Second Circuit did not rely on the SEC's approach to hybrid instruments in deciding Southbrook, see At Home Corp. v. Cox Commc'ns, Inc., 340 F. Supp. 2d 404, 409 n.7 (S.D.N.Y. 2004). Despite these limitations, the Court finds the SEC's views persuasive.

### c. Adoption of the Bifurcated Approach

Following the SEC amicus brief, District Courts have adopted the SEC's bifurcated approach to hybrid instruments. See At Home

Corp. v. Cox Commc'ns, Inc., 340 F. Supp. 2d at 409 (explaining
that (1) the acquisition of the hybrid instrument constitutes a
Section 16(b) purchase based on the fixed price component; (2)
the conversion of the hybrid instrument does not constitute a
Section 16(b) purchase if the conversion occurs at the fixed
price; and (3) the conversion of the hybrid instrument
constitutes a Section 16(b) purchase if the conversion occurs at
the floating price);[14] Schaffer, 280 F. Supp. 2d at 142 (finding
"that a hybrid instrument presents an investor with not one, but
two opportunities to lock in profit and conduct short-swing
trading based on inside information: first, at the acquisition of
the [] stock, due to the fixed formula, and again at the
conversion of the [] stock, due to the floating formula").

    This Court finds that relative to the "either/or"
approaches, the bifurcated approach "more clearly comports with
the purpose of Section 16(b) and the [SEC 1991 a]mendments."
Schaffer, 280 F. Supp. 2d at 141.  This Court thus joins other
courts in adopting the bifurcated approach to hybrid instruments.
Accordingly, the conversion of the June 2004 Note at the floating
price constitutes a Section 16(b) purchase.  The Court finds that
Plaintiff establishes (1) purchases and (2) sales of shares of

---

[14] The Court notes that on appellate review of the At Home Corp.
District Court decision, the Second Circuit did "not consider the §
16(b) ramifications of an option exercised according to a floating
price mechanism."  446 F.3d at 408 n.4.  The Second Circuit thus has
not provided comprehensive guidance on the treatment of hybrid
instruments.

ASI common stock (3) within a six-month period.  Plaintiff
thereby satisfies three of the four elements required for Section
16(b) liability.  See Gwozdzinsky, 156 F.3d at 308.  The Court
now turns to the fourth element, statutory insider status.  See
id. (the purchases and sales must be made "by an officer or
director of the issuer or by a shareholder who owns more than ten
percent of any one class of the issuer's securities").

### F.    All Defendants are Beneficial Owners

A statutory insider is an officer of the issuer, director of
the issuer, or a ten-percent beneficial owner of the issuer's
securities.  See 15 U.S.C. § 78p(b); see also Gwozdzinsky, 156
F.3d at 308.  It is undisputed that none of the Defendants is an
officer or director of ASI.  However, the parties dispute whether
the Defendants are beneficial owners of ASI common stock.
Plaintiff argues that all of the Defendants are beneficial
owners, and Defendants argue that only Cannell is a beneficial
owner.  The Court finds that all of the Defendants are beneficial
owners of ASI common stock.

Section 16(b) does not define the term "beneficial owner."
However, in 1991, the SEC promulgated Rule 16a-1(a)(1) "to
determine who is a ten-percent beneficial owner and therefore a
statutory insider."  Feder v. Frost, 220 F.3d 29, 33 (2d Cir.

2000).[15]  The Rule 16a-1(a)(1) definition of beneficial ownership

relies on "section 13(d) of the Act and the rules [issued]

thereunder."  17 C.F.R. § 240.16a-1(a)(1).  Rule 13d-3(a),

promulgated under Section 13(d) of the Act, provides that "solely

for purposes of determining whether a person is a beneficial

owner of more than ten percent of any class of equity

securities," a beneficial owner is:

> [A]ny person who, directly or indirectly, through any
> contract, arrangement, understanding, relationship, or
> otherwise has or shares:
>
> (1) Voting power which includes the power to vote, or
> to direct the voting of such security, and/or,
>
> (2) Investment power which includes the power to
> dispose, or direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a)(1).  Based on this Rule 16a-1(a)(1)

definition, Defendants argue that Cannell is the sole beneficial

owner because Cannell had sole voting and investment power with

---

[15] The SEC also promulgated Rule 16a-1(a)(2) "for purposes of the
reporting and short-swing profit provisions of Section 16." Feder,
220 F.3d at 34.  Rule 16a-1(a)(2) provides that "other than for
purposes of determining whether a person is a beneficial owner of more
than ten percent of any class of equity securities," a beneficial
owner is: "[A]ny person who, directly or indirectly, through any
contract, arrangement, understanding, relationship or otherwise, has
or shares a direct or indirect pecuniary interest in the equity
securities."  17 C.F.R. § 240.16a-1(a)(2).  In turn, a "pecuniary
interest" is "the opportunity, directly or indirectly, to profit or
share in any profit derived from a transaction in the subject
securities."  17 C.F.R. § 240.16a-1(a)(2)(i).
    It is undisputed that all Defendants had an opportunity to share
in the profits derived from Tonga's purchases and sales of ASI common
stock.  Accordingly, Tonga, Cannell Capital, and Cannell all had a
pecuniary interest in the relevant transactions.  Tonga, Cannell
Capital, and Cannell thus fall within the Rule 16a-1(a)(2) definition
of beneficial ownership.

respect to the shares of ASI common stock purchased and sold by Tonga.  (See Defs.' Mem. 20-21; Defs.' Reply Mem. 13-17; Defs.' Opp. Mem. 17-22.)

It is undisputed that (1) Tonga purchased and sold shares of ASI common stock; (2) Cannell Capital served as the general partner of Tonga, a limited partnership entity; (3) Cannell Capital thus exercised sole voting and investment power for Tonga (see Hecht Decl. Ex. 1 Art. 6); (4) Cannell served as the sole managing member of Cannell Capital, a limited liability company; and (5) Cannell, acting through Cannell Capital, thus exercised sole voting and investment power for Tonga (see Hecht Decl. Ex. 2 Art. 5.1, 5.2).

However, Tonga's delegation of voting and investment power to Cannell Capital does not divest Tonga of such power. Likewise, Cannell Capital's exercise of this voting and investment power through Cannell does not divest Cannell Capital of such power.  See Huppe, 2008 U.S. Dist. LEXIS 51259, at *10-12 (finding that the exercise of voting and investment power by a general partner acting on behalf of a limited partnership is the exercise of that power by the limited partnership itself); see also Romeo & Dye § 2.03[5][f] ("A corporation, partnership, limited liability company, or other entity should be deemed the beneficial owner of its portfolio securities for purposes of the ten percent owner calculation.  The fact that only natural

persons can make voting and investment decisions for the entity does not mean that the entity itself is not a beneficial owner."); id. § 2.03[5][f][ii] ("Where the general partner of a limited partnership is a corporation or other entity, then that entity too is a beneficial owner of the partnership's portfolio securities for purposes of the ten percent owner calculation.")

Accordingly, the Court finds that Tonga, Cannell Capital, and Cannell all satisfy the Rule 16a-1(a)(1) definition of beneficial ownership.[16] To hold otherwise would create a strong incentive for short-swing profiteers to establish limited partnerships and other entities to evade being deemed beneficial owners as defined by Rule 16a-1(a)(1).

The Court finds that Plaintiff establishes the statutory insider status of all Defendants. Plaintiff thereby satisfies the fourth (and final) element required for Section 16(b) liability. Accordingly, the Court finds that all Defendants are liable under Section 16(b).

## III.  Section 16(b) Disgorgement

The Court now turns to calculating the disgorgement of the profits realized by Tonga, Cannell Capital, and Cannell. At the

---

[16] In reaching this conclusion, the Court does not rely on (1) Defendants' Rule 13D filing (see Twersky Decl. Ex. F), or (2) the Section 13(d)(3) and Rule 13d-5(b) group theory of beneficial ownership. The Court thus does not reach the parties' arguments concerning these issues. (See Pl.'s Mem. 17-20, Defs.' Opp. Mem. 18-22, Pl.'s Reply Mem. 9-14, Defs.' Mem. 24-25, Pl.'s Opp. Mem. 23-28, Defs.' Reply Mem. 12-17.)

outset, the Court offers two observations.  First, "[w]here more than one person subject to Section 16 of the Act is deemed to be a beneficial owner of the same equity securities . . . the amount of short-swing profit recoverable shall not be increased above the amount recoverable if there were only one beneficial owner." 17 C.F.R. § 240.16a-1(a)(3).  Second, an "insider is jointly and severally liable for the Section 16(b) profit with any other beneficial owner of the securities."  Arnold S. Jacobs, Section 16 of the Securities Exchange Act § 2:60 (2008) (citing Blau v. Lamb, 242 F. Supp. 151, 161 (S.D.N.Y. 1965)); see also id. § 3:22.

### A.   Tonga's Disgorgement

It is undisputed that Tonga possessed a 100% pecuniary interest in the profits realized from the purchases and sales of shares of ASI common stock.  Tonga is thus subject to disgorgement of all profits realized from these transactions.

Under Section 16(b), profits are calculated pursuant to the rule of "lowest price in, highest price out."  Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir. 1943) ("the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions . . .").  Thus, profits are computed by "arbitrarily matching [the] highest-priced sales transactions with the lowest-priced purchases."  Donoghue v. Natural Microsystems Corp., 198 F. Supp. 2d 487, 492 (S.D.N.Y. 2002).

31

Tonga purchased shares of ASI common stock on two occasions. See supra Section II(E)(I)-(ii). Under the bifurcated approach, Tonga purchased (1) 850,000 shares of ASI common stock at the fixed price of $2.00 per share when it acquired the June 2004 Note;[17] and (2) 851,341 shares at the floating price of $1.05 per share when it converted the June 2004 Note.[18] See SEC amicus brief, 2001 WL 34120374, at *28 (a statutory insider purchases (1) a minimum number of shares based on the fixed price component at acquisition, and (2) any additional shares obtained at conversion based on the floating price component); Schaffer, 280 F. Supp. 2d at 141. Tonga's purchases are as follows:

| Date | Number of Shares Purchased | Purchase Price Per Share |
|------|---------------------------|--------------------------|
| June 30, 2004 | 850,000 | $2.00 |
| November 10, 2004 | 851,341 | $1.05 |

Between November 10, 2004 and November 15, 2004, Tonga sold

---

[17] It is undisputed that the reverse stock split referenced in the conversion formula occurred prior to Tonga's acquisition of the June 2004 Note. When it acquired the June 2004 Note, Tonga thus purchased shares of ASI common stock at $2.00 per share. (Compare Pl.'s Mem. 11-12 with Defs.' Opp. Mem. 24.) The Court notes the following calculation:

$1,700,000 principal ÷ $2.00 per share = 850,000 shares

[18] The parties do not dispute the floating price of $1.05 per share at the time of the conversion of the June 2004 Note. (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 46.) The parties also do not dispute that Tonga converted the balance of the June 2004 Note and the interest accrued thereon into a total of 1,701,341 shares. (See id.) The Court notes the following calculation:

1,701,341 shares - 850,000 shares = 851,341 shares

1,701,341 shares of ASI common stock in the open market.
See supra Section I(G).  Tonga sold these shares as follows:

| Date | Number of Shares Sold | Sale Price Per Share |
|------|----------------------|----------------------|
| November 10, 2004 | 183,858 | $6.62 |
| November 10, 2004 | 254,100 | $6.34 |
| November 11, 2004 | 360,074 | $4.14 |
| November 12, 2004 | 726,475 | $3.52 |
| November 15, 2004 | 360,700 | $3.69 |

(See Twersky Decl. Ex. K 8.)

To calculate the profits realized, the Court matches the lowest purchase price per share to the highest sale price per share.  For example, Tonga sold 183,858 shares at the highest sale price per share, $6.62.  Tonga purchased more than 183,858 shares at the lowest purchase price per share, $1.05.  Thus, the Court matches $1.05 and $6.62 for these 183,858 shares.  Tonga's profits realized are calculated as follows:

| Number of Shares | Purchase Prices (from lowest to highest) | Sale Prices (from highest to lowest) | Profit Per Share | Recoverable Profits |
|------|------|------|------|------|
| 183,858 | $1.05 | $6.62 | $5.57 | $1,024,089.06 |
| 254,100 | $1.05 | $6.34 | $5.29 | $1,344,189.00 |
| 360,074 | $1.05 | $4.14 | $3.09 | $1,112,628.66 |
| 53,309 | $1.05 | $3.69 | $2.64 | $140,735.76 |
| 307,391 | $2.00 | $3.69 | $1.69 | $519,490.79 |
| 542,609 | $2.00 | $3.52 | $1.52 | $824,765.68 |

Accordingly, Tonga realized profits of $4,965,898.95.[19]  The Court thus finds that Tonga is subject to disgorgement of $4,965,898.95.

**B.    Cannell Capital's Disgorgement**

Plaintiff argues that Cannell Capital had two separate pecuniary interests in the profits realized by Tonga: "(1) an 11.547% pecuniary interest in the equity securities of Tonga in November 2004, and (2) pursuant to Rule 16a-1(a)(2)(ii)(C), Cannell Capital's pecuniary interest in the incentive fee paid to it by Tonga."  (Pl.'s Mem. 22 (internal citations omitted).)  Defendants (1) use a different percentage to calculate Cannell Capital's pecuniary interest in the equity securities of Tonga (see Defs.' Mem. 24 & 24 n.11, Defs.' Reply Mem. 17 & 17-18 n.7); and (2) dispute that the incentive fee Tonga paid to Cannell Capital is subject to disgorgement (see Defs.' Opp. Mem. 24-25; Defs.' Supplemental Mem. 2-6, D.E. 71).  The Court finds genuine

_____

[19] The Court notes the following calculations underlying the first column –

1.    Tonga purchased 851,341 shares at $1.05 per share:
      183,858 + 254,100 + 360,074 + 53,309 = 851,341

2.    Tonga purchased 850,000 shares at $2.00 per share:
      307,391 + 542,609 = 850,000

3.    Tonga sold 360,700 shares at $3.69 per share on November 15, 2004:  53,309 + 307,391 = 360,700

The Court further notes that Tonga sold an additional 183,866 shares of stock for $3.52 per share on November 12, 2004.  These shares are not at issue in this action because they cannot be matched to any shares purchased within six months of the sale date.

issues of material fact with respect to both of Cannell Capital's alleged pecuniary interests.  Accordingly, the Court denies summary judgment to Plaintiff and Defendants with respect to the disgorgement calculation for Cannell Capital.

### i. Cannell Capital's Pecuniary Interest in the Equity Securities of Tonga

Rule 16a-1(a)(2) provides that a general partner of a limited partnership holds an "indirect pecuniary interest" in the "general partner's proportionate interest in the portfolio securities . . . as evidenced by the partnership agreement in effect at the time of the transaction and the partnership's most recent financial statements."  17 C.F.R. § 204.16a-1(a)(2)(ii)(B); see also Strauss v. Am. Holdings, Inc., 902 F. Supp. 475, 481 (S.D.N.Y. 1995).  It is thus undisputed that Cannell Capital's pecuniary interest in Tonga's equity securities is subject to disgorgement.

The parties use different percentages to determine Cannell Capital's proportionate interest in Tonga's portfolio securities. Plaintiff argues that at the relevant time, Cannell Capital held "an 11.547% pecuniary interest in the equity securities of Tonga."  (Pl.'s Mem. 22 (citations omitted).)  This percentage is Cannell Capital's pro-rata percent interest in Tonga as reported on the "Partners' Capital and Net Change in Partners' Capital (After Incentive Fees)" statement for the month ended October 31, 2004 (the "October post-incentive fee statement").  (See Twersky

35

Decl. Ex. O D008834.)  Defendants use 12.393% to determine this
pecuniary interest.  (See Defs.' Mem. 24 & 24 n.11, Defs.' Reply
Mem. 17 & 17-18 n.7.)  This percentage is Cannell Capital's pro-
rata percent interest in Tonga as reported on the "Partners'
Capital and Net Change in Partners' Capital (After Incentive
Fees)" statement for the month ended November 30, 2004 (the
"November post-incentive fee statement").  (See Twersky Decl. Ex.
O D008847.)

The Court finds that the October statement governs this
matter.  The plain language of Rule 16a-1(a)(2) requires the use
of the ownership interest set forth in the most recent financial
statement at the time of the relevant transaction.  See 17 C.F.R.
§ 204.16a-1(a)(2)(ii)(B).  Tonga sold 1,701,341 shares of ASI
common stock between November 10, 2004 and November 15, 2004.  At
that time, the most recent statement was the October statement.

However, this determination does not automatically require
the Court to adopt the 11.547% pecuniary interest set forth by
Plaintiff.  The October statement includes a pre-incentive fee
statement and a post-incentive fee statement.  (See Twersky Decl.
Ex. O D008832-35.)  For the reasons stated in Section
III(B)(ii)(a), there is a genuine issue of material fact with
respect to whether the October post-incentive fee statement
reveals only estimated calculations.  If it reveals only
estimated calculations, the Court would instead apply the 11.154%

found in the October pre-incentive fee statement.  There is a
genuine issue of material fact with respect to whether the fact-
finder should apply (1) the 11.154% pro rata percent interest set
forth in the October pre-incentive fee statement, or (2) the
11.547% pro rata percent interest set forth in the October post-
incentive fee statement.  The Court thus denies summary judgment
to Plaintiff and Defendants with respect to Cannell Capital's
pecuniary interest in Tonga's equity securities.

### ii. Cannell Capital's Pecuniary Interest in the Incentive Fee

Rule 16a-1(a)(2)(ii)(C) provides that an "indirect pecuniary
interest" includes "[a] performance-related fee, other than an
asset-based fee, received by any broker, dealer, bank, insurance
company, investment company, investment advisor, investment
manager, trustee or person or entity performing a similar
function."  17 C.F.R. § 240.16a-1(a)(2)(ii)(C).  It is undisputed
that Cannell Capital received "a 'Special Profit Allocation'
which constituted a performance-related fee of twenty percent of
Tonga's profits."  (Defs.' Supplemental Mem. 1 & 1 n.1 (citing
Tonga's Articles of Limited Partnership dated July 1, 1992, as
amended and restated as of December 31, 1995 ("1995 LP
Agreement"), Mulligan Decl. Ex. A § 17(b)(2), D.E. 72)); see also
Pl.'s Supplemental Mem. 2-3, D.E. 75 (citing 1995 LP Agreement,
Skovron Decl. Ex. A § 17(b), D.E. 76).)  However, this
determination does not end the Court's inquiry.

The Rule 16a-1(a)(2)(ii)(C) exception provides that "[n]o pecuniary interest shall be present where:"

> (1) The performance-related fee, regardless of when payable, is calculated based upon net capital gains and/or net capital appreciation generated from the portfolio or from the fiduciary's overall performance over a period of one year or more; <u>and</u>

> (2) Equity securities of the issuer do not account for more than ten percent of the market value of the portfolio.  A right to a nonperformance-related fee alone shall not represent a pecuniary interest in the securities.

17 C.F.R. § 240.16a-1(a)(2)(ii)(C)(1)-(2) (emphasis added).

Defendants thus seek to establish that (1) the incentive fee is calculated on a yearly basis (<u>see</u> Defs.' Opp. Mem. 25 (citing Twersky Decl. Ex. Q D007658); Defs.' Supplemental Mem. 3-6); and (2) Tonga's investment in ASI accounted for less than ten percent of the market value of Tonga's portfolio investments (<u>see</u> Defs.' Opp. Mem. 25 (citing Van Doren Decl. ¶ 2; D.E. 58); Defs.' Supplemental Mem. 6).  Plaintiff argues that Defendants cannot satisfy either element of the Rule 16a-1(a)(2)(ii)(C) exception.[20]  (<u>See</u> Pl.'s Reply Mem. 16-18; Pl.'s Supplemental Mem. 5-7.)  The Court finds a genuine issue of material fact with respect to whether the incentive fee here falls within the Rule 16a-1(a)(2)(ii)(C) exception.  Accordingly, the Court denies

---

[20] Plaintiff also notes that Defendants' Rule 16a-1(a)(2)(ii)(C)exception argument is an affirmative defense raised at the summary judgment stage, but does not argue that Defendants should be barred from raising this "affirmative defense."  (<u>Compare</u> Pl.'s Reply Mem. 16 <u>with</u> Pl.'s Reply Mem. 7 n.2.)  The Court thus does not reach this issue.

summary judgment to Plaintiff and Defendants with respect to
Cannell Capital's pecuniary interest in the incentive fee.

### a.    Calculated on a Yearly or a Monthly Basis

It is undisputed that the 1995 LP Agreement provides for any
incentive fee to be calculated and paid on a yearly basis.  (See
Pl.'s Supplemental Mem. 5; Defs.' Supplemental Mem. 2.)  However,
the parties dispute whether, in practice, the incentive fee was
calculated on a monthly basis (see Pl.'s Supplemental Mem. 5-7)
or a yearly basis (see Defs.' Supplemental Mem. 3-6).  This
dispute centers on the June 2004-December 2004 pre-incentive fee
and post-incentive fee statements.  (See Twersky Decl. Ex. O.)
After further review of these statements, the Court finds that
there exists a genuine issue of material fact with respect to
whether the incentive fee is calculated on a yearly basis or a
monthly basis.[21]

---

[21] On August 8, 2008, the Court directed the parties to provide "a
precise explanation" of how the "Partners' Capital and Net Change in
Partners' Capital" statements reveal that "the incentive fee is
calculated on a yearly basis (as Defendants argue) or a monthly basis
(as Plaintiff argues)."  The Court further directed the parties "not
to rely on (1) Tonga's Amended and Restated Limited Partnership
Agreement dated December 1, 2004 (see Twersky Decl. Ex. Q D007658), or
(2) Tonga's investment summary dated April 12, 2004 (see Twersky Decl.
Ex. P D005203)" in providing this explanation.  The Court explained
that it "does not rely on these documents because there is
insufficient evidence to establish that these documents were in effect
during the relevant time period."  (Aug. 8, 2008 Order 1-2, D.E. 69.)
   Both parties submitted supplemental briefing in response to the
Court's August 8, 2008 Order, and Defendants also submitted a
supplemental declaration of Richard van Doren (D.E. 73).  By letter
dated August 22, 2008, Plaintiff requested (1) to file a motion to
strike this supplemental declaration, or (2) in the alternative, to
conduct additional discovery on the facts set forth in the

Plaintiff argues that the post-incentive fee statements, "on their face[,] indicate that an incentive fee calculation and allocation were made for each respective month based upon the profits allocated to the limited partners' capital accounts for that period." (Pl.'s Supplemental Mem. 6 (citing Twersky Decl. Ex. O D008845-48).) The Court agrees that the existence of the post-incentive fee statements for each month facially indicates the calculation and payment of the incentive fee on a monthly basis. However, Plaintiff fails to explain why the pre-incentive fee "period end adjusted capital" (not the post-incentive fee "period end adjusted capital") is used as the "beginning capital" for the next month.[22] If the incentive fee is calculated and

supplemental declaration. On August 27, 2008, the Court found that (1) a "motion to strike is unnecessary," and (2) "[t]he discovery deadline passed long ago, and no good cause has been shown to extend it." (Aug. 27, 2008 Order, D.E. 79.)

By letter dated September 3, 2008, Plaintiff requested to supplement the record with a November 14, 2006 letter written by defense counsel to plaintiff's counsel. Plaintiff argues that inter alia this letter (1) demonstrates that "Plaintiff specifically sought during the discovery period the production of documents relating to the incentive fees paid by Tonga to Cannell Capital," and (2) contains an admission by defense counsel that "directly contradict[s]" the supplemental declaration. By letter dated September 4, 2008, Defendants opposed Plaintiff's request. The Court denies Plaintiff's request to supplement the record with the November 14, 2006 letter at this time, but Plaintiff may renew its request before any trial or evidentiary hearing in this matter.

Although the Court relies on the parties' supplemental briefing in this Order, it does not rely on the supplemental declaration of Richard van Doren or the November 14, 2006 letter. However, the Court notes that these documents further support the Court's finding of a genuine issue of material fact with respect to whether the incentive fee is calculated on a yearly basis or a monthly basis.

[22] As an example, the Court traces Cannell Capital's investment in Tonga through October and November 2004. The October pre-incentive

paid at the end of a month, then the following month's pre-incentive fee statement should reflect that calculation and payment. However, the Court cannot find such a reflection in the statements. Accordingly, the Court finds a genuine issue of material fact with respect to Plaintiff's position.

Defendants argue that the post-incentive fee statements for each month "include an estimated calculation of a possible incentive fee (reflected in the column entitled 'Incentive Fee'), that might be paid to Cannell Capital at year end based on Tonga's performance in that month." (Defs.' Supplemental Mem. 5.) Defendants further argue that "the actual determination of

---

fee statement records Cannell Capital's "period end adjusted capital" as $20,261,877. The October post-incentive fee statement records Cannell Capital's "period end adjusted capital" as $20,975,610 (based on adding an incentive fee payment of $713,732 to the pre-incentive fee "period end adjusted capital" of $20,261,877). If the incentive fee was calculated and paid to Cannell Capital on a monthly basis (as Plaintiff argues), then the Court would expect the November pre-incentive fee statement to record Cannell Capital's "beginning capital" as $20,975,610. However, the November pre-incentive fee statement records Cannell Capital's "beginning capital" as $20,261,877 (the October pre-incentive fee "period end adjusted capital"). (See Twersky Decl. Ex. O D008832, D008834, D008845.)

Similarly, the November pre-incentive fee statement records Cannell Capital's "period end adjusted capital" as $22,051,183. The November post-incentive fee statement records Cannell Capital's "period end adjusted capital" as $25,550,288. The December pre-incentive fee statement records Cannell Capital's "beginning capital" as $22,051,183 (not as $25,550,288). (See Twersky Decl. Ex. O D008845, D008847, D008858.)

The Court notes that incentive fee payments by Tonga's limited partners are reflected in the post-incentive fee statements for each month, but not in the pre-incentive fee statements for each of the following months. (See, generally, Twersky Decl. Ex. O.) Thus, although the statements calculate a monthly incentive fee, it is not clear whether these calculations are (1) merely estimates, or (2) the basis of actual payments.

41

whether the incentive fee will be paid takes place at the end of
Tonga's fiscal year based upon its performance over the entire
year, as required by Tonga's limited partnership agreement."

(Id.)  This explanation accounts for the discrepancy discussed
above.  However, this explanation conflicts with facts set forth
in Defendants' Local Civil Rule 56.1 Statement, in which
Defendants rely on the pro rata percent interest recorded in each
month's post-incentive fee statement to establish Cannell
Capital's ownership percentage in Tonga.  (See Defs.' 56.1 Stmt.
¶¶ 6-11.)  It is inconsistent for Defendants to (1) rely on the
post-incentive fee statements in their Local Civil Rule 56.1
Statement; and (2) claim that the post-incentive fee statements
are only estimated calculations in their summary judgment
briefing.  Based on this inconsistency, the Court finds a genuine
issue of material fact with respect to Defendants' position.

Accordingly, the Court finds a genuine issue of material
fact with respect to whether the incentive fee is calculated on a
monthly basis or a yearly basis.  The Court therefore finds a
genuine issue of material fact with respect to the application of
the Rule 16a-1(a)(2)(ii)(C) exception.  The Court thus denies
summary judgment to Plaintiff and Defendants with respect to
Cannell Capital's pecuniary interest in the incentive fee.

### b.    Ten Percent of the Market Value

For the sake of completeness, the Court notes that

Defendants satisfy the second element of the Rule 16a-1(a)(2)(ii)(C) exception. The Court finds that at the relevant time, Tonga's investment in ASI "did not account for more than ten percent of the market value of Tonga's investment portfolio." (Van Doren Decl. ¶ 2.)

Defendants submit an unsworn declaration under penalty of perjury to establish this element. Pursuant to 28 U.S.C. § 1746, such a submission has the "force and effect" of a sworn declaration or affidavit. Plaintiff argues that the Court should not consider this declaration because it is "conclusory," a "hearsay statement by a declarant who was not even employed by Tonga," and "not corroborated by any documentary evidence or other facts describing the basis of the declarant's knowledge of Tonga's securities portfolio." (Pl.'s Reply Mem. 18.) However, the declarant set forth a specific fact, not a conclusory or speculative assertion. Further, given Cannell Capital's undisputed role as the general partner of Tonga and its exclusive responsibility as the general partner to "manage[] and control" Tonga's business (see Hecht Decl. Ex. 1 Art. 6), the declarant, the Chief Financial Officer of Cannell Capital, has personal knowledge of Tonga's portfolio investments. See 3 James Wm. Moore et al., Moore's Federal Practice § 56.14[1][c] (3d ed. 2007) ("Personal knowledge may also flow logically from the context of the affidavit.").

43

Accordingly, the Court finds the declaration to be credible evidence that Tonga's investment in ASI did not account for more than ten percent of the market value of Tonga's portfolio investments.[23]

Despite this finding on the second element of the Rule 16a-1(a)(2)(ii)(C) exception, as discussed above, the Court finds a genuine issue of material fact with respect to the first element. The Court thus finds a genuine issue of material fact with respect to the application of the Rule 16a-1(a)(2)(ii)(C) exception. Accordingly, the Court denies summary judgment to Plaintiff and Defendants with respect to Cannell Capital's pecuniary interest in the incentive fee.

### C. Cannell's Disgorgement

It is undisputed that at all relevant times, Cannell's ownership percentage in Cannell Capital was 99.9%. (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 15.) Accordingly, Cannell's

---

[23] Plaintiff argues that it "has not had the opportunity to conduct discovery concerning the market value of the ASI investment in Tonga's portfolio and possesses no documentary evidence bearing on the issue." (Pl.'s Reply Mem. 17.) On July 28, 2006, this Court entered a scheduling order setting a discovery cut-off date of October 26, 2006. (D.E. 16.) Magistrate Judge Ellis later extended this deadline to December 21, 2006. (D.E. 19, 21, 22.) A scheduling order "may be modified only for good cause" and with leave of the Court. Fed. R. Civ. P. 16(b)(4). Plaintiff fails to demonstrate good cause for its failure to conduct discovery on this issue prior to the discovery cut-off date. Plaintiff pursues disgorgement of the incentive fee paid by Tonga to Cannell Capital pursuant to Rule 16a-1(a)(2)(ii)(C). Accordingly, the Court finds that Plaintiff should have pursued discovery related to the Rule 16a-1(a)(2)(ii)(C) exception prior to the discovery cut-off period. The Court will not reopen discovery on this issue at the summary judgment stage.

pecuniary interest in the profits realized by Tonga are 99.9% of Cannell Capital's pecuniary interest in the profits realized by Tonga.  However, the Court cannot calculate Cannell's disgorgement because the Court finds genuine issues of material fact with respect to (1) Cannell Capital's alleged pecuniary interest in Tonga's equity securities, and (2) Cannell Capital's alleged pecuniary interest in the incentive fee.  (See <u>supra</u> Section III(B)(I)-(ii).)  Accordingly, the Court denies summary judgment to Plaintiff and Defendants with respect to the disgorgement calculation for Cannell.

### D.    Pre-Judgment Interest

"[T]he question of whether [pre-judgment] interest should be given in a particular case is within the discretion of the trial court."  <u>Morales v. Freund</u>, 163 F.3d 763, 767 (2d Cir. 1999) (citation omitted); <u>see also</u> <u>Morales v. Gould Investors Trust</u>, 445 F. Supp. 1144, 1156 (S.D.N.Y. 1977).  Because "Section 16(b) says nothing about interest one way or the other," the Supreme Court has held that interest should be "'given in response to considerations of fairness'" and "'denied when its exaction would be inequitable.'"  <u>Blau v. Lehman</u>, 368 U.S. 403, 414 (1962) (quoting <u>Board of County Comm'rs v. United States</u>, 308 U.S. 343, 352 (1939)).  Courts are disinclined to award pre-judgment interest when defendants, although liable, have not acted in bad faith (i.e., abused inside information).  <u>See</u> <u>Freund</u>, 163 F.3d at

767; <u>Gould Investors Trust</u>, 445 F. Supp. at 1156. In this case, Plaintiff presents only speculation that Defendants acted on insider information or otherwise acted in bad faith. (<u>See, e.g.</u>, Pl.'s Mem. 5-8, Defs.' Opp. Mem. 3-5.) Plaintiff thus fails to establish bad faith. Accordingly, the Court denies Plaintiff's request for pre-judgment interest. (<u>See</u> Pl.'s's Mem. 24.)

E. **Post-Judgment Interest**

Although Section 16(b) makes no reference to post-judgment interest, Plaintiff may recover such interest pursuant to 28 U.S.C. § 1961(a), which provides that post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." <u>See</u> <u>Donoghue v. Miracor Diagnostics, Inc.</u>, No. 00 Civ. 6696, 2002 U.S. Dist. LEXIS 2461, at *13-14 (S.D.N.Y. Feb. 11, 2002) (awarding post-judgment interest in a Section 16(b) action). Accordingly, the Court grants Plaintiff's request for post-judgment interest (<u>see</u> Pl.'s Mem. 24), and orders that such interest be paid in accordance with 28 U.S.C. § 1961(a)-(b) (<u>see</u> Romeo & Dye § 12.05[2]).

IV. <u>**Conclusion**</u>

For the reasons stated above, the Court GRANTS in part Plaintiff's motion for summary judgment (D.E. 37) and DENIES in its entirety Defendants' cross-motion for summary judgment (D.E. 44).

Under Section 16(b), Plaintiff is entitled to disgorgement

of all profits realized by Defendants from the short-swing insider trading discussed above. Tonga is subject to disgorgement in the amount of $4,965,898.95. There are genuine issues of material fact with respect to the disgorgement calculations for Cannell Capital and Cannell. The Court denies Plaintiff's request for pre-judgment interest, but awards post-judgment interest.

With respect to the disgorgement calculations for Cannell Capital and Cannell, the parties shall file a Joint Pretrial Order pursuant to the Court's Individual Practices no later than October 17, 2008. This case is deemed Ready for Trial October 20, 2008.[24]

SO ORDERED.

Dated:     New York, New York
           September **26**, 2008

_Kimba M. Wood_
Kimba M. Wood
United States District Judge

---

[24] At any time after the Ready Trial Date, the Court may call the parties to trial upon forty-eight hours notice. No adjournment of that trial date will be permitted, unless counsel has faxed to chambers an affidavit stating that he or she is engaged in trial in another court. This affidavit shall include: (1) the caption of the other case, including its index number; (2) the expected length of the trial; (3) the court in which the other case is to be tried; and (4) the name and telephone number of the judge presiding over the case. Counsel shall notify the Court and all other counsel in writing, at the earliest possible time, of any particular scheduling problems involving out-of-town witnesses or other exigencies.